Argued January 12, reversed June 2, rehearing granted July 7, 1914.
Former opinion sustained on rehearing December 21, 1914.

# KALICH *v*. KNAPP.

(142 Pac. 594; 145 Pac. 22.)

**Municipal Corporations—Control by Legislature.**

1. Section 3206 et seq., L. O. L., being a general law for the organization of cities and towns, establishing the procedure therefor and investing enumerated civil and criminal powers in such municipalities, and Laws of 1913, page 541, amendatory thereof, does not affect the applicability of the motor vehicle law (Laws 1911, pp. 265–278) to the City of Portland, which at the enactment of the latter act was acting under a special charter.

**Municipal Corporations—Control by Legislature—Constitutional and Statutory Provisions.**

2. Portland City charter (Sp. Laws 1903, pp. 3–172), Sections 72, 73, gives the council all legislative powers and authority of the City of Portland, and gives power to exercise within the limits of the city the powers commonly known as police powers to the same extent as the state could exercise that power, to regulate and control the use of the streets for vehicles of all descriptions, and to control and limit traffic on the streets, avenues and elsewhere. Pursuant thereto, the city adopted ordinances in 1904 and 1906, regulating the speed of automobiles on streets of the city. The motor vehicle law (Laws 1911, pp. 265–278) regulates the use of motor vehicles throughout the state. Article XI, Section 2, of the Constitution, provides that corporations may be formed under general laws, but shall not be created by the legislative assembly by special laws, and that the legislative assembly shall not enact, amend or repeal any charter or act of incorporation for any municipality. *Held,* that the motor vehicle law is unconstitutional in so far as it attempts to regulate the speed of automobiles in Portland; such regulation being an amendment of the city charter.

ON REHEARING.

**Municipal Corporations—Control by Legislature—Constitutional Provisions.**

3. Article XI, Section 2, of the Constitution, as amended, declaring that corporations may be formed under general laws, and that the legislature shall not enact, amend or repeal any charter of any municipality, but that the legal voters of every city and town are granted power to enact and amend their municipal charter subject to the Constitution and criminal laws of the state, and Article IV, Section 1a, reserving the initiative and referendum powers to the legal voters of every municipality as to all local, special and municipal legislation, insure to each municipality a full measure of home rule, and place beyond the power of the legislature to make any change in local, special and municipal legislation and the legislature may not amend any municipal charter directly or indirectly where the amendment is the subject of municipal concern and regulation, and motor vehicle law (Laws 1911, p. 265), regulating the use of motor vehicles throughout the state, is unconstitutional in so far as it attempts to regulate the speed of automobiles in municipalities, though the act contains a criminal provision, which is not a criminal law of the state within the Constitution.

**Constitutional Law—Legislative Power—Constitutional Provisions.**

4. The amendment of Article IV, Section 1, of the Constitution, declaring that the legislative authority shall be vested in a legislative assembly; that the people reserve to themselves the power to propose laws and amendments to the Constitution and to enact or reject the same, and also reserve the power to approve or reject any acts of the legislative assembly, does not lessen the powers of the legislature in matters of legislation only, but the legislature is not the exclusive agent of legislation, and such power is conferred on the people by Article XI, Section 1, and Article IV, Section 1a, reserving to the people the initiative and referendum.

**Municipal Corporations — Control by Legislature — Public or Local Concern.**

5. All public matters concerning the people of the state at large, in common with people of any particular municipality, are matters of state jurisdiction within Article XI, Section 2, of the Constitution, prohibiting the legislature from enacting, amending or repealing any charter of any municipality, but empowering the legal voters of every city to enact and amend their municipal charter subject to the Constitution and criminal laws of the state, and Article IV, Section 1a, reserving to the voters of every municipality the power over local, special and municipal legislation, while all public affairs concerning the inhabitants of a locality as a municipality, apart from the people of the state at large, as supplying purely local needs are matters of local concern, within the exclusive control of each municipality.

[As to powers conferred on municipality by constitutional grant of local self-government, see note in Ann. Cas. 1914D, 969.]

From Multnomah: HENRY E. McGINN, Judge.

This is an action by Peter Kalich against F. C. Knapp to recover damages for an alleged personal injury. From a judgment in favor of defendant, plaintiff appeals. The facts are stated in the opinion of the court.                                        REVERSED.

For appellant there was a brief over the name of *Messrs. King & Saxton,* with an oral argument by *Mr. Will R. King.*

For respondent there was a brief over the name of *Messrs. Wilbur, Spencer & Dibble,* with an oral argument by *Mr. Ralph W. Wilbur.*

Department 1. MR. JUSTICE McNARY delivered the opinion of the court.

As the result of colliding with an automobile driven by defendant, plaintiff brings this action to recover $35,000 damages for a personal injury. The accident occurred shortly after midnight on November 19, 1911, at the intersection of Williams Avenue and Russell Street, in Portland. During the trial of the case, plaintiff offered in evidence certified copies of certain ordinances purposed to regulate the speed of motor vehicles within the limits of the municipality, but upon the objection of counsel for defendant, the court refused to allow the ordinances to be introduced into the case, upon the ground that the ordinances had been superseded by an act of the legislative assembly of the State of Oregon, known as the "Oregon Motor Vehicle Law," General Laws of 1911, pages 265–278. The result of the trial was a verdict in favor of defendant, whereupon plaintiff prosecutes this appeal.

The ordinances, being three in number, were adopted by the city during the years 1904 and 1906, and, considered as one specie of legislation, forbid any person to drive or operate an automobile at any point on the streets of the city at a greater speed than 15 miles per hour, or at a speed of more than 10 miles per hour within the fire limits, or at a speed greater than a walk upon any street where street-cars turn. This local municipal legislation was enacted agreeably to the powers vested in the city by a charter granted by the state legislature in 1903: Laws 1903, pp, 3–172. The portion of the charter appropriate to the subject under consideration follows:

"Sec. 72. The council shall have and exercise exclusively all legislative powers and authority of the City of Portland, and no legislative powers or authority, either expressed or implied, shall be exercised by any other person or persons, board or boards, other than the council. The council shall have full power and authority, except as herein otherwise provided, to exercise all powers conferred upon the city by this charter and the Constitution and laws of the State of Oregon."

"Sec. 73. The council has power and authority, subject to the provisions, limitations and restrictions in this charter contained—

"(1) To exercise within the limits of the City of Portland all the powers, commonly known as the police powers, to the same extent as the State of Oregon has or could exercise said power within said limits; * *

"(60) Except as otherwise provided in this charter, or in the Constitution or laws of the State of Oregon, to regulate and control, for any and every purpose, the use of the streets, highways, alleys, sidewalks, public thoroughfares, public places, and parks of the city; to regulate the use of streets, roads, highways, and public places for foot passengers, animals, bicycles, automobiles and vehicles of all descriptions; * *

73 Or.—36

"(63) To control and limit traffic on the streets, avenues and elsewhere."

So far as is necessary to an understanding of the matter here involved, the Oregon motor vehicle law, provides:

"An act providing for regulating the use, registration, license, identification, conduct and operation of vehicles operated upon the public roads, streets and highways of the State of Oregon; to regulate and license the persons who drive the same; to prescribe penalties for violations hereof and to prohibit the unauthorized possession or use of a vehicle and to provide penalty therefor; to license and identify all motor vehicles; to limit the authority of cities and towns on like subjects concerned with said vehicles, and to repeal all acts and parts of acts either in conformity or in conflict herewith. * * "

Sec. 2, subdivision 17: "The rate of speed on all streets, roads and highways of this state shall be a reasonable speed, up to and not exceeding twenty-five miles an hour, but any speed in excess of twenty-five miles an hour upon any road or highway of this state shall be an unreasonable speed and is prohibited by this act; provided, however, that no motor vehicle shall be driven at a rate faster than eight miles an hour upon the country roads or highways of this state when within one hundred yards of any vehicle drawn by horse or horses."

Sec. 25: "Local authorities shall have no power to pass, enforce or maintain any ordinance, rule or regulation (1) requiring of any owner or operator of a vehicle any license fee or permit to use the public highways, or excluding or prohibiting any vehicle whose owner has complied with this act from the free use of streets, roads or highways of this state, except such driveway, speedway or road as has been or may be expressly set apart by law for the exclusive use of horses and light carriages, or except as herein provided; (2) affecting the registration or numbering of vehicles or

prescribing a slower rate of speed than herein specified at which such vehicle may be operated, or the use of the streets, roads and highways of this state, contrary or inconsistent with the provisions of this act; and all such ordinances, rules of regulations now in force are hereby declared to be of no validity or effect; provided, however, that the local authorities may limit by ordinance, rule or regulation hereafter adopted, the speed of vehicles on the streets within their respective corporate limits, on condition that such ordinance, rule or regulation shall also fix the same speed limitation for all vehicles, not to be in any case less than one mile in six minutes and on further condition that local authorities shall also have placed conspicuously on each main street, road and highway of this state where the boundary of such local authority crosses the same and on every main street where the rate of speed changes, signs of sufficient size to be easily readable by persons using the same, bearing the words 'Slow down to —— miles' (the rate being inserted) and with an arrow pointing in the direction where the speed is to be reduced or changed; and provided further, that said ordinance, rule or regulation shall fix the penalties for violation thereof similar to and no greater than those prescribed by this act for violation of speed limitation by any vehicles; and provided further, that nothing in this act contained shall be construed as limiting the power of local authorities to make, enforce and maintain further ordinances, rules or regulations affecting vehicles which are used to carry the public for hire.''

Admitted by all, is the proposition, that but a single problem is here involved, namely, since the amendment of Article XI, Section 2, of the state Constitution, effective December 3, 1910, can the legislature enact a statute, general in its application, calculated to repeal certain ordinances of the City of Portland theretofore enacted pursuant to the powers granted to the city in its charter? A consideration of this question impels a brief review of the organic and

statutory laws applicable thereto.    Article XI, Section 2, of the Constitution reads:

"Corporations may be formed under general laws, but shall not be created by the legislative assembly by special laws.    The legislative assembly shall not enact, amend or repeal any charter or act of incorporation for any municipality, city or town.    The legal voters of every city and town are hereby granted power to enact and amend their municipal charter, subject to the Constitution and criminal laws of the State of Oregon."

1. The legislative assembly of 1893, Section 3206 et seq., L. O. L.; passed a general law providing for the organization of cities and towns, establishing the procedure therefor, and investing enumerated civil and criminal powers in such municipalities.    An amendment of this act was had at the session of the legislature for 1913, page 541,    This course of general legislative enactment is impotent in its bearing so far as it affects the subject under consideration, for the City of Portland was, at the time of this particular legislation, clothed in a charter granted by the law-making body, and therefore cannot arrogate unto itself any supplementary power by virtue of the legislation in question.    In *Riggs* v. *City of Grants Pass,* 66 Or. 266 (134 Pac. 776), this court, speaking through Mr. Justice EAKIN with reference to the general law pertaining to the formation of cities, said:

"It does not operate as an amendment of city charters; but charters may be amended to take advantage of powers granted."

2. To appreciate understandingly the real inspiration productive of Article XI, Section 2, of the Constitution, as well as its expected corrective force, is but to recall the ills accompanying legislative creation of

and interference with municipal charters which natur-
ally provoked a deep-seated resentment among the
chartered communities. Tinkering with municipal
charters became a most enjoyable pastime of the
legislators and a favorite ground for the employment
of their activities. To eradicate the abuses too often
arising from legislative interference with matters
wholly municipal in character, the people of the state
by initiative action ingrafted this provision upon the
organic law of the state. In the light of this condition,
the Constitution must be considered and interpreted.
Therefore, we believe the people of the state meant
literally what they said when they used the expression
that:

"The legislative assembly shall *not* enact, amend
or repeal any charter or act of incorporation for any
municipality, city or town."

This language admits of no other interpretation
than that the people purposed to curtail the power of
the legislature in all matters of legislation pertaining
to the creation of a municipal charter, its amendment
or nullification. To yield to the thought that the con-
stitutional enactment must be construed to inhibit the
legislature from committing a direct assault upon the
charter of a particular city, yet, permitting that very
object to be obtained by making the law apply gen-
erally to all municipalities in the state, is to close the
eyes to a full reading of the provision, and to license
the legislature to do that by indirection which it is ex-
pressly forbidden to do directly. The argument that
the constitutional provision means that the legislature
may, by general enactment, regulate the internal
affairs of the cities and towns of the state, but are
prohibited from passing a similar law having refer-

ence to a particular municipality, is giving life to the character of the act rather than to the substance of the Constitution, and is equivalent to saying that the legislature may do with the Constitution as it pleases so long as it selects a general conveyance rather than a particular vehicle.

In adding this constitutional mandate, there was no design to emancipate any city from general legislation by the legislative assembly affecting the body of the people of the state in those matters wholly involving state-wide policies and activities, or to prevent appropriate action by the lawmakers upon any of the topics regarding which the Constitution sanctions legislation, but only in respect to those phases of purely municipal government properly regulated by charters and embracing matters of internal municipal regulation. The wisdom of the body politic in conceiving and adopting this addition to the fundamental law of the state is grounded on the proposition that each municipality is best suited to govern its own affairs. What might be the proper height of a building in one city, the distance the dwellings should be located from the street line in some populous district as a protection from the ravages of fire, and the speed automobiles should travel on the congested thoroughfares of a metropolis, are considerations properly of a municipal concern, differing as widely as the cities differ from the hamlets and wholly beyond the domain of legislative understanding.

Returning to the constitutional provision, this language will be observed:

"Corporations may be formed under general laws, but shall *not* be created by the legislative assembly by special laws."

The formation of incorporations by general laws alone is permitted. The next sentence contains this inhibition:

"The legislative assembly shall not enact, amend or repeal any charter or act of incorporation for any municipality, city or town."

The formation of corporations by general laws, that is, providing through general legislation, the implements by which a community may initiate its existence and form and mold its shape is permitted, but from the legislature the people of the state have withdrawn its former prerogative to enact, amend or repeal any municipal charter by such a specie of legislation. Had the electors of the state desired municipal legislation by general laws, the first sentence of the Constitution would have read:

"Corporations may be formed and the charters of municipal corporations enacted, amended or repealed under general laws."

By the force of Article XI, Section 2, of the Constitution, the electors of municipalities are, subject to the Constitution and criminal laws and such general laws as may be enacted by the legislature affecting the relation of the state to the locality, made the legislative assembly to enact the laws germane to the general purpose and object of the municipality, free from legislative molestation, which autonomy in a sense constitutes a sovereign city, subject at all times, however, to the supreme will of the state, reserved by the people of the state through the initiative and referendum provision of the fundamental law.

Counsel for respondent finds much comfort in the case of *Straw* v. *Harris,* 54 Or. 424 (103 Pac. 777), and offers the conclusion of that opinion as decisive of the

case under consideration. The legislature in its biennial session in 1909 passed an act designed to provide a method for the incorporation, under general laws, of ports in communities bordering upon bays or rivers navigable from the sea. Several cities of Southwestern Oregon found this act a suitable conveyance for their amalgamation as a port. Litigation resulted, and in consequence thereof, this court, in a well-considered opinion written by Mr. Justice KING, said, among other things:

"The act under consideration by permitting the incorporation of ports does not thereby directly attempt to amend the charter of any city or town within the boundaries thereof. Under any view, it may only affect the charters and ordinances of such cities and towns to the extent that they may be in conflict or inconsistent with the general object and purpose for which the port may be organized. This the Constitution clearly intended to permit; that is to say, a general law thereunder is provided whereby the people within the municipality created under it may take such steps in support thereof as may be necessary, even though its success may require, on the part of the included municipalities, a surrender of some of the rights or privileges previously granted to or acquired by them. Incorporated cities and towns may change or amend their charters at any time in the manner provided by the Constitution. The power to do so, however, is derived from the people of the state, and is necessarily limited to the exercise of such powers, rights and privileges as may not be inconsistent with the maintenance and perpetuity of the state, of which public corporations are but the mere instrumentalities of government. In other words, the powers thus acquired do not rise higher than their source."

The act of the law-making body receiving the thoughtful consideration of the court was one sanctioned by the constitutional provision in its first sen-

tence, which reads, ''Corporations may be formed under general laws.'' This enactment had solely for its purpose a plan of procedure for the formation of ports, and therefore did not purport to amend or annul the charter of any city, and, further, such legislation was general in its application, and outside of the province of charter regulation. It is true that the court in that decision said, in substance, ''that the state cannot surrender its sovereignty to the municipalities.'' This the state has not done by circumscribing the power of the legislature over municipal charters, as the sovereignty in this state resides in the people. They have retained unto themselves, under the initiative and referendum provision of the Constitution, power to create, amend, or annul a municipal charter, though denying that privilege to their representatives through which they commonly speak. While there may be certain statements contained in *Straw* v. *Harris* indicative of a different conclusion than here announced they fall in the category of gratuitous observations unnecessary of consideration in a decision of the points involved. Nor do we think the decisions of this court subsequent, yet following in the wake of *Straw* v. *Harris,* conflict with the doctrine of this case.

From these principles we conclude the lower court erred in refusing to admit the ordinances in evidence, and that the Oregon motor vehicle law (Laws 1911, pp. 265–278) is unconstitutional so far as it attempts to regulate the speed of automobiles in the City of Portland.      REVERSED.   REHEARING GRANTED.

MR. JUSTICE MOORE and MR. JUSTICE RAMSEY concur.

MR. CHIEF JUSTICE MCBRIDE dissents.

Former opinion sustained December 21, 1914.

ON REHEARING.

(145 Pac. 22.)

In Banc.   MR. JUSTICE MCNARY delivered the opinion of the court.

In the original opinion of this case, reported in 142 Pac. 594, the majority of the court composing department No. 1 decided that Article XI, Section 2 of the Constitution withheld the legislature from amending or repealing the charter of any city, or the ordinances enacted pursuant thereto in respect to those matters peculiar to municipal regulation, though reserving that power to the sovereignty through the initiative and referendum provision of the fundamental law.   At a rehearing of the case, counsel for defendant presented argument for a reversal, which is clearly embodied in the scholarly dissenting opinions of Mr. Chief Justice MCBRIDE and Mr. Justice BURNETT, to which our attention will now be briefly given.   Owing to the importance of the questions suggested and their grave bearing upon future legislation, we think it not amiss succinctly to state our position anew.   Looking backward over the path of our state legislation, we observe that the organic law primarily contained the following clause:

"Corporations may be formed under general laws, but shall not be created by special laws, except for municipal purposes.   All laws passed pursuant to this section may be altered, amended, or repealed, but not so as to impair or destroy any vested corporate rights": Article XI, Section 2, of the Constitution.

3. With pleasing fidelity to this provision of the Constitution, the recurring legislative assemblies

created municipal corporations, and lavishly bestowed their time upon the amendment of particular charters until a remedy was sought and obtained by the people in the adoption of the constitutional provision under consideration.

"Corporations may be formed under general laws, but shall not be created by the legislative assembly by special laws. The legislative assembly shall not enact, amend or repeal any charter or act of incorporation for any municipality, city or town. The legal voters of every city and town are hereby granted power to enact and amend their municipal charter, subject to the Constitution and criminal laws of the state of Oregon": Article XI, Section 2, as amended.

A comparison of the two provisions of the fundamental law will at once reveal the intention of the voters and the evil they purposed to correct. The original section of the Constitution permitted the legislature to create municipal life by special law, and to clothe it with a charter which could be altered or repealed at any legislative session, when either the municipal welfare or political exigencies required.

Over the municipality the legislature had exclusive and unrestrained control, and, having the power to create, so it had the power to modify or destroy. In fact, the ultimate sovereign power of the state over its cities and towns was unquestioned. To remedy the many ills flowing from the absolute dependency of cities upon the autocratic will of the legislature and its oft-repeated interference in matters of local concern, the people conceived the idea of city sovereignty as a separate attribute of state sovereignty; consequently we have, by the adoption of the constitutional provision under consideration, vested our cities with more political power than they heretofore possessed since the formation of our state government. The electors

now are, subject to the Constitution and the criminal laws not affecting local regulation, made the legislative assembly to enact and amend the local laws which should regulate their municipal affairs. In the former opinion, this court said:

"By the force of Article XI, Section 2, of the Constitution, the electors of municipalities are, subject to the Constitution and criminal laws and such general laws as may be enacted by the legislature affecting the relation of the state to the locality, made the legislative assembly to enact the laws germane to the general purpose and object of the municipality, free from legislative molestation, which autonomy in a sense constitutes a sovereign city, subject at all times, however, to the supreme will of the state, reserved by the people of the state through the initiative and referendum provision of the fundamental law."

In the studiously considered case of *Branch* v. *Albee,* 71 Or. 188 (142 Pac. 598), a majority of this court reaffirmed the same construction, saying through Mr. Justice RAMSEY.

"Said section, as amended, first withdraws from the legislative assembly all power that it previously had to enact, amend and repeal charters, and then confers upon the legal voters of every city and town power to enact and amend their charters, and this power, thus conferred upon cities and towns, is made subject to the Constitution and the criminal laws of the state. It is not made subject to the *civil* laws of the state. The conclusion seems to be irresistible that the people, by the adoption of said amendment, intended to withdraw from the legislative assembly all power that it previously possessed to enact, amend or repeal charters or acts incorporating cities or towns, and to confer upon the legal voters of cities and towns all of said power, *except* the power to *repeal* charters. If effect is given to the language of this amendment, no other conclusion appears to be tenable": 71 Or. 188 (142 Pac. 600).

Referring to the same provision of the Constitution in the case of *Thurber* v. *McMinnville,* 63 Or. 410 (128 Pac. 43), Mr. Chief Justice McBRIDE said:

"We are of the opinion that the true intent of the amendment above quoted was to give to cities and towns the authority to enact and amend charters affecting property and other rights within the boundaries of such cities and towns, and that, so far as legislation outside of these boundaries is concerned, they must find it elsewhere than in this amendment. Inside their boundaries, and in relation to matters purely local, they are, as regards regulation by the state legislature, supreme; beyond these boundaries they are invested with no power except that which the legislature may see fit to grant them in common with all other cities, and under like circumstances."

At this juncture, we deem it prudent carefully to consider the case of *City of Portland* v. *Nottingham,* 58 Or. 1 (113 Pac. 28), on account of its similitude to the one in hand. The point we desire to develop is that this case is an authority for the doctrine enunciated in the original opinion in *Kalich* v. *Knapp, ante,* p. 558 (142 Pac. 594), namely, that the legislature is inhibited by the Constitution from amending the charter of the municipality either by special or general legislation in those matters of local and municipal concern. In January, 1903, the charter of the City of Portland provided, among other things, that a property owner who was displeased at the assessment levied upon his property for a street improvement could appeal to the Circuit Court, but that the verdict of the jury should be a conclusive determination of the questions giving birth to his grievance. A dispute having arisen between the city and Mr. Nottingham regarding the reassessment of the property of the latter, the remedy provided by the charter provision

was invoked, resulting in a verdict for the city, which was set aside by the court and a new trial granted. The city prosecuted an appeal to this court upon the assumption that the legislature did, at its biennial session in 1907 (Laws 1907, c. 162, p. 311), adopt an act whereby an appeal was allowable. Considering the vital question whether the legislature could, by general enactment, amend a charter provision, this court, in a forceful opinion written by Mr. Justice BURNETT, said:

"This provision of the Constitution (Article XI, Section 2), was adopted by the people at the June election of 1906, and went into effect upon the proclamation of the Governor, June 25th of that year. Its effect is to take from the legislative assembly the right to amend the charter of the City of Portland, although enacted by the legislative assembly itself in January, 1903."

Further, Article IV, Section 1 (a), of the Constitution, provides that:

" 'The initiative and referendum powers reserved to the people by this Constitution are hereby further reserved to the legal voters of every municipality and district, as to all local, special and municipal legislation, of every character, in or for their respective municipalities and districts.' These constitutional provisions confer ample and *exclusive* power upon the people of every municipal corporation to regulate their own affairs respecting municipal legislation and procedure. The legislative assembly cannot pass laws to repeal or amend municipal charters, even by implication, respecting such matters."

After extracting from the Motor Act the criminal element therein contained, we cannot discern any appreciable difference in the principle propounded in these two cases, viz., that the Constitution as it is now built withholds the legislature from amending any

municipal charter by legislation, be it direct or indirect, general or special, which is properly and purely the subject of municipal concern and regulation.

As additional evidence of their political intention to preserve the ancient right of local self-government of municipalities, the people of the state in June, 1906, ingrafted on the Constitution (Article IV, Section 1(a), which provides:

"The initiative and referendum powers reserved to the people by this Constitution are hereby further reserved to the legal voters of every municipality and district, as to all local, special, and municipal legislation, of every character, in or for their respective municipalities and districts."

This provision of the Constitution like Article XI, Section 2, was designed to insure to each incorporated community a full measure of home rule and to place beyond the capacity of the legislature the power to make any change in the system of government of any municipality by legislation other than that authority reserved to the legislature in Article XI, Section 2. Since the adoption of these constitutional provisions this court has given thought to their intendments and limitations, and has, we think, generally arrived at the conclusions reached in this case: *Farrell* v. *Port of Portland,* 52 Or. 582 (98 Pac. 145); *Haines* v. *City of Forest Grove,* 54 Or. 443 (103 Pac. 775); *City of McMinnville* v. *Howenstien,* 56 Or. 451 (109 Pac. 81); *City of Portland* v. *Nottingham,* 58 Or. 1 (113 Pac. 28); *State* v. *Schluer,* 59 Or. 18 (115 Pac. 1057); *State* v. *Hearn,* 59 Or. 227 (115 Pac. 1066, 117 Pac. 412); *McKeon* v. *City of Portland,* 61 Or. 385 (122 Pac. 291); *State* v. *Port of Tillamook,* 62 Or. 332 (124 Pac. 637, Ann. Cas. 1914C, 483); *Thurber* v. *McMinnville,* 63 Or. 410 (128 Pac. 43); *Riggs* v. *Grants Pass,*

66 Or. 266 (134 Pac. 776); *Kalich* v. *Knapp, ante,* p. 558 (142 Pac. 594); *Branch* v. *Albee,* 71 Or. 188 (142 Pac. 598). True, in such cases as *Straw* v. *Harris,* 54 Or. 424 (103 Pac. 777), *Kiernan* v. *Portland,* 57 Or. 454 (111 Pac. 379, 112 Pac. 402, 37 L. R. A. (N. S.) 339), and *Churchill* v. *Grants Pass,* 70 Or. 283 (141 Pac. 164), the court seems to have announced the rule that the amendments adverted to are competent to restrain the legislature in the enactment of special but not general laws affecting the municipalities.

With vigor the argument is pressed upon us that on account of the Motor Act (Laws 1911, p. 275), containing a clause providing a penalty for its violation, that the act is a criminal law, and therefore without the competency of municipal legislation, citing *Baxter* v. *State,* 49 Or. 353 (88 Pac. 677, 89 Pac. 369), and *State* v. *Schluer,* 59 Or. 18 (115 Pac. 1057). In these cases the question arose as to whether a city could amend its charter under Article XI, Section 2, of the Organic Act so as to be legal proof against the operation of the local option law: Laws 1905, p. 47. After a careful review of the provision of the Constitution, this court held that the local option law was general 'in its scope and criminal in its character, and therefore within the power of legislative expression. Without doubt these cases were correctly decided, for the subject matter of the local option law involves either the sale or prohibition of intoxicating liquors, and for that reason was the proper subject for legislative action. Treated as either a moral or an economic question, the state has, in the interest of better citizenship, abundant authority to regulate the sale of alcoholic liquors and to provide a punishment for disobedience to the law, whether we consider the prohibitory legislation from the standpoint of a criminal law or an enactment in-

volving the state in its sovereign capacity. Problems of this kind lie too deep for municipal solution and far beyond the limits of purely municipal concern.

The concept that the Motor Act is a criminal law finds its mainspring in the last sentence of Article XI, Section 2, of the Constitution:

"The legal voters of every city and town are hereby granted power to enact and amend their municipal charter, subject to the Constitution and criminal laws of the State of Oregon."

Recurring to Section 23 of the Motor Act, it will be observed that a punishment is provided for the infractors of the law which it is argued brings the act within the power of the legislature to adopt. Considered by itself, the constitutional provision last quoted might supply the legislature with sufficient excuse for this legislation, even though it had the legal effect of amending or superseding a city charter or ordinance. But this section cannot be construed alone, as at the same election an amendment to Article IV was adopted, but inserted after Section 1, designated as Section 1(a), *supra*. Particularly do we desire to accentuate this sentence:

"The initiative and referendum powers reserved to the people by this Constitution are hereby further reserved to the legal voters of every municipality and district, as to *all* local, special, and municipal legislation, of every character, in and for their respective municipalities and districts."

These two amendments, referring as they do to the same subject matter, must be considered together, and be so interpreted as to carry out the intent of the framers and the people who have adopted them. In reading the excerpt from Article IV, Section 1(a), it will be noticed that the powers created by Article XI,

Section 2, were enlarged and made applicable "to *all* local, special and municipal legislation of every character."

In considering the two sections of the Constitution for the purpose of welding an harmonious construction, we think it was the clear intention of the electors of the state to restrain the legislature from legislating in criminal matters affecting those subjects that are purely local and municipal in character. But in those public matters which concern the people of the state at large, in common with the inhabitants of the chartered communities, the legislature has undoubted power to define those acts which shall constitute a crime and provide a penalty for their infraction. This must be so, else we shall have dissipated the greatest power for the preservation of order, and without which the government of the state would be incomplete, and utterly fail to attain one of its great ends, the protection and security of person and property in organized cities, as well as throughout its entire territory. Certainly the necessity of enlarging municipal powers in both civil and criminal matters, wholly local is thoroughly appreciated, even by the casual observer of the conditions in the crowded modern centers of population, yet, even so, the constitutional amendments only grant unto the cities the exclusive right to exercise such powers, civil or criminal, as legitimately belong to their local and internal affairs, and beyond this the legislative assembly and the people of the state, speaking through the initiative, occupy a field of action exclusively their own.

The City of Portland received its charter from the hands of the legislature at the session of 1903: Sp. Laws of 1903, pp. 3–172. By that franchise it was ordained that the common council should have full

power and authority to exercise all powers conferred by the charter and the Constitution and laws of the state. To the council was given, coextensive with the state, the right to exercise within the limits of the city, all the powers commonly known as the police power, and to regulate and control the use of its streets and the traffic thereon, except as otherwise provided in the Constitution and laws of the State of Oregon: Sections 72 and 73. By these provisions of the charter, the legislature vested the city with the same authority over its streets as the state itself possessed. As an expression of this potentiality, the ordinances were enacted in 1904 and 1906; hence at the time of their enactment the City of Portland had, within its corporate limits, concurrent power with the state to pass laws relative to the regulation and control of traffic over the streets of the city. The constitutional provisions forming the meat of this discussion were adopted by the people of the state in 1906, and had for their effect the removal of legislative authority over the subject of municipal traffic; consequently, at the time of the passage of the Motor Act through the legislature in 1911, that department of government was impotent to nullify or amend the charter or ordinances of the City of Portland in a matter of acknowledged local concern such as the regulation of traffic over the streets of the metropolis.

From what has been said it must follow "as night the day" that the Motor Act, if valid expressly amends every charter of every municipality in the state by divesting such cities of the power to pass or enforce ordinances in conflict with the statute. To assert that the adoption of the act is not an amendment but a suppression by paramount authority is but a hollow statement that must fall for the want of a distinguish-

ing prop. The desideratum is to discover the intended effect of the legislation rather than the particular choice of words that may be used to express that effect. If the statute nullifies the charter or ordinances of the incorporated communities, it supersedes them either by suppression by paramount authority or by amendment. The resultant effect is the same. And from what has been said this cannot be done. In the title of the Motor Act we are confronted with this declaration: "To limit the authority of cities and towns on like subjects concerned with * * vehicles." In Section 25 of the act, we find an express statement that local authorities shall have no power to prescribe a lower rate of speed than in the enactment provided. Without doubt, the legislative act embraces the same subject matter as the ordinances and is in direct conflict therewith, and if the statute is constitutional, then it expressly repeals the ordinances. In aid of our deductions that this language works an amendment of the charter, we adduce *State* v. *Wright,* 14 Or. 365 (12 Pac. 708) ; *Warren* v. *Crosby,* 24 Or. 558 (34 Pac. 661).

4. Associated with the other questions is this one: Does the supreme law of the state prohibit the people from diminishing the power of the legislature in the exercise of any of its original prerogatives of legislation? The primary draft of the Constitution, ratified by the electors of the territory in 1857 and approved later by the Congress of the United States, specified that:

"The legislative authority of the state shall be vested in the legislative assembly, which shall consist of a Senate and House of Representatives": Article IV, Section 1, Constitution.

Thus did the people of the state so hew and shape the body of their fundamental law as to constitute

the legislature the only instrument through which the people could express their choice on legislative matters. As a result of political expansion, the people amended this section of the Constitution by imposing an indirect limitation on the legislature compelling that institution to share its powers of legislation with that of the people publicly expressed through the initiative. For we read that:

"The legislative authority of the state shall be vested in a legislative assembly, consisting of a Senate and House of Representatives, but the people reserve to themselves power to propose laws and amendments to the Constitution and to enact or reject the same at the polls, independent of the legislative assembly, and also reserve power at their own option to approve or reject at the polls any act of the legislative assembly": Article IV, Section 1, as amended in June, 1902.

Here, it will be seen that the people did not shorten the powers of the legislature in matters of legislation only, they did declare that the legislature was no longer to be their exclusive agency of expression. Experimentation of this character having proved popular, the electorate set about further to curtail the legislature as an organ of legislative expression. This they succeeded in accomplishing in the adoption of Article XI, Section 1, and Article IV, Section 1(a), of the Constitution, when they forbade the legislature from voicing their sentiments in matters of purely municipal concern.

We are liable to confuse the discussion of the subject if we fail to discern between sovereignty itself and that force which stands as the representative of sovereign power. The source—the abiding place of sovereignty —is in the people. Government is merely an agency by which it is exercised. The legislative body is but a

component of that agency—a contrivance by which the people crystallize their ideas into the form of legislation. Therefore, in the enactment of organic legislation having for its function the abridgment of legislative power, the people of the state are not parting with any of their sovereignty, rather they are exercising their right to express this sovereign power directly. In time the people may strip the legislature of every power it once enjoyed, leaving it but a place in memory, and themselves exercise directly within the state all of the powers formerly committed to the legislature. No further need we seek to disclose the authority of this statement than to quote Article I, Section 1, of the Constitution:

"We declare that all men, when they form a social compact, are equal in right; that all power is inherent in the people, and all free governments are founded on their authority, and instituted for their peace, safety, and happiness; and they have at all times a right to alter, reform, or abolish the government in such manner as they may think proper."

Surely, then, in checking the legislature from further interference in municipal affairs does not constitute the surrender of any sovereignty. Nor does the city on that account become a miniature state, for at all times and under all forms of government sovereignty remains in the people of the state who, speaking through the initiative, may legislate on all matters unless restrained by the federal or the state Constitutions.

5. Finally, we cannot yield to the plaint that the conclusions reached are not justifiable, because judicial minds may differ with respect to the station where municipal power ends and state authority begins. The difficulty of locating the boundary between legisla-

tion that is purely municipal, and therefore within the administrative competency of cities and legislation that lies without its fold and consequently within the embrace of legislative enactment is more apparent than actual. Though it must be admitted that the differentiation is not and never can be totally free from perplexity, however, this unfortunate situation is the handmaid of many legal rules that either entwine or shade into each other without regard to the layman's dislike for complexity in legal jurisprudence. Discussing municipal affairs as distinguished from state functions, Mr. McQuillin, in his excellent treatise on Municipal Corporations, Volume 1, Section 173, says:

"All of those public matters which concern the people of the state at large in common with the people of the particular locality, as the administration of justice, and the authority of the state generally, through and by legislative enactments administered by state officers or by virtue of the power of the central government, in the preservation of the public peace and affairs of like general character, although some of which may be in the hands of the local or municipal authorities, are matters of state or central jurisdiction. On the other hand, all of those public affairs which concern the inhabitants of the locality as an organized community, apart from the people of the state at large, as supplying purely local needs, conveniences, and comforts like water, light, and gas, the establishment of sewers, fire protection, and the enforcement of by-laws or ordinances touching the interests of the local corporation alone are essential matters of local concern."

From the general principles of law herein discussed, we conclude that the judgment of the trial court is erroneous and therefore must be reversed.

REVERSED. FORMER OPINION SUSTAINED ON REHEARING.

MR. JUSTICE MOORE, MR. JUSTICE EAKIN, MR. JUSTICE
BEAN and MR. JUSTICE RAMSEY concur.

MR. CHIEF JUSTICE MCBRIDE delivered the following
dissenting opinion:

It is an old saying that "hard cases make bad law,"
and in this case I think the enactment by the legislature
of a foolish and unnecessary statute has created a
hardship which has led the court into an erroneous con-
struction of Article XI, Section 2, of our Constitution,
as now amended. The section is as follows:

"Corporations may be formed under general laws,
but shall not be created by the legislative assembly by
special laws. The legislative assembly shall not enact,
amend, or repeal any charter or act of incorporation
for any municipality, city, or town. The legal voters
of every city and town are hereby granted power to en-
act and amend their municipal charter, subject to the
Constitution and criminal laws of the State of Oregon,
and the exclusive power to license, regulate, control, or
to suppress or prohibit, the sale of intoxicating liquors
therein is vested in such municipality; but such muni-
cipality shall within its limits be subject to the pro-
visions of the local option law of the State of Oregon."

The intent of this section was to put an end to the
theretofore prevalent practice of legislative intermed-
dling with particular city charters by acts special in
their nature and not infrequently against the wish of a
majority of the voters of the municipality. The lan-
guage employed seems to me clearly to indicate a pur-
pose to prohibit special and local legislation affecting
city charters. It provides that the legislature shall
"not enact, amend, or repeal any charter or act of in-
corporation of any municipality, city, or town"—using
the singular number, whereas if it had been the intent
to prohibit general legislation affecting all towns and

cities the plural would naturally have been employed. The act in question is a statute prohibiting a certain rate of speed by automobiles, and providing a penalty for its violation.    This under the ruling in *Portland* v. *Erickson,* 39 Or. 1 (62 Pac. 753), and *Baxter* v. *State,* 49 Or. 353 (88 Pac. 677, 89 Pac. 369), makes the act in question a criminal statute, and therefore within the power of the legislature to enact in any event.    Emergencies have arisen, and may arise again, in which it is desirable that general legislation to enable towns, cities, and ports to carry on the purposes of their organization should be speedily passed without the delay incident to the adoption of a measure by the initiative, and I hesitate to assent to a ruling by this court that in the end may result in much inconvenience to the various municipalities of the state.    While deprecating legislative intermeddling with the local affairs of towns and cities in the manner the act in question has done, I consider it, not a question of power, but of public policy, which can and, no doubt will, be corrected at the next session of the legislature soon to meet.

The judgment should be affirmed.

MR. JUSTICE BURNETT delivered the following dissenting opinion:

The plaintiff brought an action to recover damages for injuries sustained by him in a collision with an automobile driven by the defendant at the intersection of Williams Avenue and Russell Street, in Portland, contending that the defendant was driving at a reckless and unlawful rate of speed.    For the purpose of proving negligence in that respect, the plaintiff offered some ordinances of the City of Portland limiting the speed of such vehicles in the city to a maximum rate of 15 miles per hour in general graded to 10 miles per

hour within the fire limits and to a rate no greater than a walk upon any street where street-cars turn. The Circuit Court sustained an objection to the introduction of these ordinances on the ground that they had been superseded by an act of the legislative assembly of the state, known as the Oregon motor vehicle law (Laws 1911, c. 174). This ruling is assigned as the principal error on an appeal by the plaintiff from a judgment against him as a result of the jury trial there. In an opinion written by Mr. Justice McNary, filed June 2, 1914, the judgment was reversed on the ground that, in the respect involved, the vehicle law was an attempt to amend the charter of the City of Portland contrary to the injunction of Article XI, Section 2, of the state Constitution, that "the legislative assembly shall not enact, amend or repeal any charter or act of incorporation for any municipality, city, or town." Involving as it does the issue of which shall be supreme the city or the state, the importance of the subject has brought about a rehearing *in banc.*

The direct question involved is the constitutionality of the vehicle law as applied to chartered cities and towns. At the outset we must remember that the legislative assembly is a co-ordinate branch of the government of equal dignity and importance with the judicial department, and if we assume to disregard or overturn its declarations of what the law shall be we must be prepared to demonstrate to a reasonable certainty that its utterances violate the Constitution, which is supreme in authority over the executive, the legislature, and the courts: *Cline* v. *Greenwood,* 10 Or. 230; *Cook* v. *Port of Portland,* 20 Or. 580 (27 Pac. 263, 13 L. R. A. 533); *Umatilla Irr. Co.* v. *Barnhart,* 22 Or. 389, 30 Pac. 37); *State* v. *Shaw,* 22 Or. 287 (29 Pac. 1028); *Simon* v. *Northup,* 27 Or. 487 (40 Pac. 560, 30 L. R. A. 171);

*Kadderly* v. *Portland,* 44 Or. 118, 143 (74 Pac. 710, 75 Pac. 222) ; *State* v. *Walton,* 53 Or. 557 (99 Pac. 431, 101 Pac. 389, 102 Pac. 173) ; *Straw* v. *Harris,* 54 Or. 424 (103 Pac. 777) ; *State* v. *Cochran,* 55 Or. 157, 179 (104 Pac. 419, 105 Pac. 884) ; *Miller* v. *Henry,* 62 Or. 4 (124 Pac. 197, 41 L. R. A. (N. S.) 97) ; *Libby* v. *Olcott,* 66 Or. 124 (134 Pac. 13).

Another doctrine equally well settled is that of *stare decisis,* to the effect that when a decision has once been rendered, it amounts to an authoritative construction of the law, and should not be disregarded or overturned except for very cogent reasons showing beyond question that on principle it was wrongly decided. The principle is that laws are largely conventional rules of action, and it is more important that the rule be settled as a guiding precept to the public than that by the action of the courts the law should be made to fluctuate like the tides: *State* v. *Clark,* 9 Or. 466; *Multnomah County* v. *Sliker,* 10 Or. 65; *Despain* v. *Crow,* 14 Or. 404 (12 Pac. 806) ; *Corvallis* v. *Stock,* 12 Or. 391 (7 Pac. 524) ; *Sheridan* v. *Salem,* 14 Or. 328 (12 Pac. 925) ; *Paulson* v. *Portland,* 16 Or. 450 (19 Pac. 450, 1 L. R. A. 673) ; *Everding* v. *McGinn,* 23 Or. 15 (35 Pac. 178).

At all the times involved in this litigation the City of Portland was working under a charter granted by the legislative assembly in 1903 (Sp. Laws 1903, p. 3), and afterward adopted by the vote of the people of that city at an election therein. That enactment equipped the council with all the legislative power of the city and subject to the provisions, limitations and restrictions contained in the act authorized the council:

"(1) To exercise within the limits of the City of Portland, all the power, commonly known as the police power, to the same extent as the State of Oregon has or could exercise said power within said limits; * *

(60) except as otherwise provided in this charter, or in the Constitution or laws of the State of Oregon, to regulate and control for any and every purpose the use of the streets, highways, alleys, sidewalks, public thoroughfares, public places, and parks of the city; to regulate the use of streets, roads, highways, and public places for foot passengers, animals, bicycles, automobiles, and vehicles of all descriptions; * * (63) to control and limit traffic on the streets, avenues, and elsewhere."

The municipal legislation above referred to was enacted under the provisions of this charter. The motor vehicle law is a general act of the legislative assembly applicable by its terms to all public roads, streets, and highways in the State of Oregon. It permits a maximum speed of 25 miles per hour, declares that local authorities shall have no power to pass, enforce or maintain any ordinance, rule or regulation inconsistent with the provisions of the act, and provides that cities may limit the speed of vehicles on their streets on condition that the minimum shall in no case be less than one mile in six minutes. Other conditions are annexed to the exercise of local authority on the subject, but these are sufficient for example.

At the threshold of the discussion it will be observed that under the very terms of the charter itself, in subparagraph 60 of Section 73 *supra,* the city is permitted to exercise the power in question "except as otherwise provided in this charter or in the Constitution or laws of the State of Oregon." The exception makes no distinction between the civil and criminal laws of the state as a limitation upon the powers of the council. Hence, for the time being, we need not concern ourselves about whether the motor vehicle law is a criminal statute or not, within the meaning of Article XI, Section 2, of the state Constitution. The people of Portland in

adopting their fundamental law have thus expressly made the legislative power of their city council subject and subordinate to both the civil and criminal laws of the state as well as its Constitution. It follows that when the council adopts an ordinance conflicting with any state law, that body exceeds the legislative powers delegated to it by the people of the city and its legislation of that nature must yield and be set aside at all points of such conflict. In that charter the people of Portland themselves have asserted the supremacy of the laws of the state without distinction over the enactments of the city council. Laying aside for the moment all other questions, it is beyond dispute that the council cannot lawfully exceed its legislative authority defined and limited by the charter under which it acts. Viewing the matter from the standpoint of the city alone, its charter is paramount in authority over the council, and at least until the people of the municipality change that instrument by their initiative power the council must obey it. The legal voters of Portland have not yet amended their charter in the respect involved, and as the ordinance in question is plainly in conflict therewith because it exceeds the limiting words of the charter "except as otherwise provided in this charter or in the Constitution or laws of the State of Oregon," the ordinance is void so far as not in harmony with the motor vehicle law enacted by the state legislature. Based merely upon a construction of the fundamental law of the City of Portland, the disquisition might well end here, for the supremacy of the state law is reserved under the very instrument upon which the plaintiff depends.

Owing to the importance of the question, however, it is proper to consider anew the relative authority of the state and of cities and towns within its borders as

defined in Article XI, Section 2, of the state Constitution:

"Corporations may be formed under general laws, but shall not be created by the legislative assembly by special laws. The legislative assembly shall not enact, amend or repeal any charter or act of incorporation for any municipality, city or town. The legal voters of every city and town are hereby granted power to enact and amend their municipal charter, subject to the Constitution and criminal laws of the State of Oregon, and the exclusive power to license, regulate, control, or to suppress or prohibit, the sale of intoxicating liquors therein is vested in such municipality; but such municipality shall within its limits be subject to the provisions of the local option law of the State of Oregon."

The evil which gave rise to this expression of the will of the people as part of the fundamental law forbidding the legislative assembly to enact, amend, or repeal any municipal charter is well described by Mr. Justice McNary in the former opinion, to the effect that the legislative assembly had wasted much valuable time in dealing with particular charters of various cities and towns throughout the state which might have been more profitably devoted to general legislation. Ambitious villages were often burdened with charters sufficiently comprehensive for the metropolis, and each measure of the kind required as much attention as any other. The people, therefore, said in this amended section that corporations of whatever kind may be formed under general laws, but shall not be created by the legislative assembly by special laws. Going further into particulars, and by way of reiteration, it restrains its body of lawmakers from devoting any attention in any way to any single charter or act of incorporation. It left unrestricted and unchanged the general power of leg-

islation lodged by the Constitution with the legislative assembly.

The state is the paramount unit of government established by the people. This same people has ordained in Article I, Section 4, of its fundamental law that "the legislative authority of the state shall be vested in a legislative assembly consisting of a Senate and House of Representatives," reserving to the people, of course, the power to enact laws or to reject those promulgated by the legislature. Thus the general power of legislation remains in the legislative assembly as from the beginning of the state, and the reservation by the people was designed to be a corrective exception. As much as ever before, the rule applies as laid down in *Straw* v. *Harris,* 54 Or. 424, 428 (103 Pac. 777, 779), as follows:

"That in the enactment of laws, the legislative department of a state, unlike that department of the national government, may enact any law not expressly or impliedly prohibited by the Constitution."

It is also there said by Mr. Justice KING:

"There remains, however, as formerly, but one legislative department of the state. It operates, it is true, differently than before—one method by the enactment of laws directly through that source of all legislative power, the people; and the other, as formerly, by their representatives—but the change thus wrought neither gives to nor takes from the legislative assembly the power to enact or repeal any law, except in such manner and to such extent as may therein be expressly stated. * * The powers thus reserved to the people merely took from the legislature the exclusive right to enact laws, at the same time leaving it a co-ordinate legislative body with them."

Considering Article XI, Section 2, and Article IV, Section 1a, of the Constitution, conferring upon mu-

nicipalities and districts the initiative and referendum powers reserved to the people, Mr. Justice KING in *Kiernan* v. *Portland,* 57 Or. 454, 467 (112 Pac. 402, 403, 37 L. R. A. (N. S.) 339), writes thus:

"It will be observed from the first sentence in Section 2 that no restriction is placed upon the legislature with respect to the enactment of general laws; the exception being that no special laws creating or affecting the municipalities shall be enacted by the legislature. Under all the rules of construction, this exception reserved to the legislative department the right, whether by the people directly through the initiative or indirectly through the legislature, to enact general laws upon the subject, making it clear that the inhibition in the next sentence has reference to special laws."

Further on in the same case the learned justice writing the opinion used this language:

"Our holding is that the state may, by constitutional provisions, directly delegate to municipalities any powers which it, through the legislature, could formerly have granted indirectly. All the prerogatives, attempted to be exercised by Portland in the construction of the Broadway Bridge, formerly could have been granted by the legislature, and the power to provide therefor, having been delegated to the city by amendment to our organic laws, is valid, and the right to exercise such powers will continue until such time as changed by general enactments of the law-making department of our state, provision for which may be made by the legislature by general laws, applying alike to all municipalities of that class, or by the people through the initiative, by the enactment of either general or special laws on the subject."

In *State ex rel.* v. *Port of Tillamook,* 62 Or. 332, 341 (124 Pac. 637, 640, Ann. Cas. 1914C, 483), Mr. Justice BEAN says:

"Such municipal corporations are always subject to the control and regulation of the lawmakers of the state in the manner directed by the Constitution: *City of McMinnville* v. *Howenstien,* 56 Or. 451, 456 (109 Pac. 81, Ann. Cas. 1912C, 193). While these public corporations are capable of adopting and amending their charter, they still continue to be agencies of the state. A general control is left in the legislative assembly."

Again, in *Riggs* v. *Grants Pass,* 66 Or. 266, 271 (134 Pac. 776, 778), Mr. Justice EAKIN, after quoting with approval the language of Mr. Justice KING in *Straw* v. *Harris,* 54 Or. 424, 428 (103 Pac. 777, 779), to the effect that "it cannot be held that the state has surrendered its sovereignty to the municipalities to the extent that it must be deemed to have perpetually lost control of them," goes on to say:

"Article XI, Section 2, of the Constitution confers power and authority upon cities to form their own charters and make their own laws within their municipal needs, that is, in local and special municipal legislation. Authority beyond that must come from the sovereign, namely, the legislature, by general laws or by the people by general or special laws."

In brief, so long as the legislative assembly promulgates only general laws, it may proceed without let or hindrance based on anything contained in Article XI, Section 2, of the Constitution. The enactment of special laws on the subject of municipal charters is the only thing forbidden to that law-making body by that section, while the people at large may enact by the initiative either general or special laws affecting charters. The circumstances produced by that section are the same as if the people had added to Article IV, Section 23, another prohibition of local or special

73 Or.—38

laws, so that besides those now there specified that section would read:

"The legislative assembly shall not pass special or local laws in any of the following enumerated cases, that is to say * * 15. Enacting, amending or repealing any charter or act of incorporation for any municipality, city or town."

Under such conditions the question to be determined would be whether the motor vehicle law is one affecting only a certain locality, and hence unconstitutional, or is it one of general application throughout the state, and consequently within the power of the legislative assembly to enact. The question is precisely the same in the present juncture.

In considering the relative authority of the state and of the city it comes to this, as stated by Mr. Justice MOORE in *State* v. *Hearn,* 59 Or. 227, 233 (117 Pac. 412, 413):

"It is an axiom that no creature can ever become greater than its creator, and as a corollary deducible from this principle the rule is universal that the police power cannot be bargained away in such a manner as to place it beyond recall."

The principle of the supremacy of the state over any municipality within its borders, when manifested only by general legislation enacted by the legislative assembly or by either general or special laws initiated and adopted by the people, was first declared by this court in the elaborate and masterly opinion of Mr. Justice KING in *Straw* v. *Harris,* 54 Or. 424 (103 Pac. 777). That opinion has been cited many times since, with approval as shown by the following precedents, and has already become a classic in the legal literature of the state. *McMinnville* v. *Howenstien,* 56 Or. 451 (109 Pac. 81, Ann. Cas. 1912C, 193); *Kiernan* v. *Port-*

*land,* 54 Or. 454, 467 (112 Pac. 402, 403, 37 L. R. A.
(N. S.) 339) ; *Portland* v. *Nottingham,* 58 Or. 1 (112
Pac. 28) ; *Bennett Trust Co.* v. *Sengstacken,* 58 Or.
333 (113 Pac. 863) ; *State* v. *Schluer,* 59 Or. 18, 37, 40
(115 Pac. 1057) ; *State* v. *Hearn,* 59 Or. 227, 233 (117
Pac. 412, 413) ; *Schubel* v. *Olcott,* 60 Or. 503, 510 (120
Pac. 375) ; *State ex rel.* v. *Port of Tillamook,* 62 Or.
332, 341 (124 Pac. 637, 640, Ann. Cas. 1914C, 483) ;
*Riggs* v. *Grants Pass,* 66 Or. 266, 271 (134 Pac. 776,
778) ; *Couch* v. *Marvin,* 67 Or. 341 (136 Pac. 6).

For authority to reverse the judgment in this case
much reliance seems to be placed upon the following
precedents : *Farrell* v. *Port of Portland,* 52 Or. 582 (98
Pac. 145) ; *Haines* v. *Forest Grove,* 54 Or. 443 (103 Pac.
775) ; *McMinnville* v. *Howenstien,* 56 Or. 451 (109 Pac.
81, Ann. Cas. 1912C, 193) ; *Portland* v. *Nottingham,*
58 Or. 1 (113 Pac. 28) ; *State* v. *Schluer,* 59 Or. 18 (115
Pac. 1057) ; *State* v. *Hearn,* 59 Or. 227 (115 Pac. 1066,
117 Pac. 412) ; *McKeon* v. *Portland,* 61 Or. 385 (122
Pac. 291) ; *State ex rel.* v. *Port of Tillamook,* 62 Or.
332 (124 Pac. 637, Ann. Cas. 1914C, 483) ; *Thurber* v.
*McMinnville,* 63 Or. 410 (128 Pac. 43) ; and *Riggs* v.
*Grants Pass,* 66 Or. 266 (134 Pac. 776). In not one of
those decisions, however, is the paramount authority
of the legislative assembly over the various cities,
towns and other municipalities doubted or questioned
when asserted by general laws. Which shall prevail
in case of conflict, a general law of the state enacted
by the legislative assembly or an ordinance or charter
of a city, is not discussed in any of them. All the doc-
trine of *Farrell* v. *Port of Portland,* 52 Or. 582 (98
Pac. 145), is that the Enabling Act of 1907 was avail-
able to the port for the purpose of amending its funda-
mental law, the act of 1907 being a general law enacted
by the legislature to provide a formula for the exer-

cise of the initiative by municipalities: *McMinnville* v. *Howenstien,* 56 Or. 451 (109 Pac. 81, Ann. Cas. 1912C, 193), decided that a city could exercise the right of eminent domain to supply its inhabitants with water from a source outside its boundaries. Mr. Justice SLATER wrote to the effect that the right was conferred by the general law of February 21, 1891, now codified in Section 6874, L. O. L. Mr. Justice KING was of the opinion that the power was incident to the general authority of the city to provide for the health and welfare of its people. However, after discussing the causes leading up to the adoption of Article XI, Section 2, of the Constitution in its new form, he is careful to sum up the matter in these words:

"As a solution of this problem the people, through their sovereign power expressed at the polls, have, by amendment of the fundamental law, transferred those special powers from the legislative department to the particular localities directly affected, leaving only a general control thereof in the legislative assembly, at the same time retaining under the initiative and referendum, all power over them, differing only in the manner of the exercise of this supervision, which supervision lies with the people at large as a legislative branch of the state. In other words, the legislative assembly, as one of the state's law-making branches, may by general laws control and regulate all its municipalities, while the people, through the direct method provided, may enact either general or special laws for this purpose."

The other members of the court concurred in the result. *Haines* v. *Forest Grove,* 54 Or. 443 (103 Pac. 775), only decides that in authorizing an issue of bonds in question by the initiative process the city had conformed substantially to the Enabling Act of 1907 thus recognizing the control of the legislative assembly

over municipalities when expressed by general laws.
To sustain his position in the instant case Mr. Justice
McNary lays great stress on what was written in *City
of Portland* v. *Nottingham,* 58 Or. 1 (112 Pac. 28), to
the effect that "the legislative assembly cannot pass
laws to repeal or amend municipal charters, even by
implication," etc.   In that case the city, acting under
the charter of 1903, had improved a street, a purely
local affair, and had assessed the expense upon the
adjacent property benefited thereby.   The charter
provided an appeal to the Circuit Court of Multnomah
County for the property owner aggrieved by the as-
sessment, and declared that the verdict of the jury
there should be a final and conclusive determination
of the question.   Nottingham appealed and the Circuit
Court on his motion set aside the verdict, rendered at
the hearing, on the ground that the jury had disre-
garded the instructions of the court.   When the
charter was promulgated there was no appeal from
an order granting a new trial in an action at law.   In
1907 (Laws 1907, p. 311), however, the legislative as-
sembly amended what was originally Section 525 of
the act of October 11, 1862, of the legislative assembly,
entitled "An act to provide a code of civil procedure"
so as to authorize an appeal from an order setting
aside a judgment and granting a new trial.   Here were
two entirely distinct procedures, the one purely local
embodied in the city charter affecting only the prop-
erty owner whose holdings in the locality were bene-
fited by the improvement and the other incorporated
in the statute regulating actions in the Circuit Courts.
Although the two laws, the code and the charter, had
no relation to each other, the city sought to appeal to
this court from the order granting a new trial in the
Circuit Court, and that, too, in the face of the charter

provision that the verdict of the jury should be a final and conclusive determination of the matter. In discussing the appeal it was decided here, in substance: (1) That to be effectual a verdict must be rendered in obedience to the law as declared by the trial court; and (2) that the amendment of the Code of Civil Procedure did not and could not affect the previously enacted charter of Portland. For that matter the legislative assembly did not pretend such a result in that instance. It would have been like contending that because 60 days are made the limit of time for taking appeals to this court, that would operate to enlarge to that period the 20-day limit for appealing from an assessment of damages in a county road proceeding (L. O. L., § 6292) or the 30 days allowed by Section 2457, L. O. L., for appeals from Justice's Courts. The Nottingham case does not affect the present question for three reasons: (1) There was a purely local matter controlled by a procedure *sui generis,* outlined by the charter and not controlled or attempted to be controlled by general legislation; (2) the right to travel on the highways, roads, and streets within the state is common to every person lawfully within the state and legislation on that subject operates upon the general public instead of any mere locality exclusively; and (3) the motor vehicle law is not an amendment of any particular charter, but is a legitimate assertion of the general legislative power of the state on a subject properly within the scope of that prerogative. *State v. Schluer,* 59 Or. 18 (115 Pac. 1057), is devoted to the construction of what was known as the "Home Rule Amendment," and discusses the question of whether it authorized the local option law to be administered with incorporated towns or with general election precincts as the units upon which to operate. The ex-

cerpt quoted above from the Hearn case shows that it recognizes the principal of state supremacy over municipalities. *McKeon* v. *Portland,* 61 Or. 385 (122 Pac. 291), held in effect that one municipal corporation could not absorb another without some action on the part of the latter as a municipality, and that the one whose annexation was sought could not commit sovereigntial suicide. The opinions in *State* v. *Port of Tillamook,* 62 Or. 332 (124 Pac. 637, Ann. Cas. 1914C, 483), *Thurber* v. *McMinnville,* 63 Or. 410 (128 Pac. 43), and *Riggs* v. *Grants Pass,* 66 Or. 266 (134 Pac. 776), all recognize the potency of a general law passed by the legislative assembly over city legislation.

The fallacy of the plaintiff's argument lies in assuming that the motor vehicle law operates as an amendment of the Portland charter. It is not a question of amendment. It is a question of supersession by paramount authority. It is analogous to the situation arising when state regulation of interstate railways must and does yield to national legislation promulgated under the interstate commerce clause of the Constitution of the United States. It may also be likened unto the supremacy of the National Bankrupt Law over the state enactments about assignments for the benefit of creditors. Amendment implies the corrective act of the author or other person having direct control at the time over the instrument or document to be amended. We do not speak of Jones amending the check or promissory note of Brown or his will or contract. The amendment of such papers is left to the author or someone having his consent. Of course in this instance the legislative assembly framed the original act constituting the Portland charter but the legal voters of the city adopted it and the constitutional amendment committed it to the city as much

as if the municipality was the original author of it. The word "amend" was doubtless put into the new constitutional section, so that the legislature might have no loophole by which to evade its injunction and tinker with individual charters on the plea that it would be only amending its own work. It was never the design, however, to divest the legislative assembly of any of its power to enact general laws of pre-eminent authority throughout the state.

The legislative assembly properly may have delegated some of its legislative power to the city, but the Constitution does not permit the law-making body of the state to abdicate that prerogative permanently. It may at any time reassert it, and is only forbidden to do so by special laws in such cases as the present. The power of the legislative assembly to pass general laws with supreme sanction has not been impaired by any amendment to the Constitution.

We further observe in our examination of Article XI, Section 2, that the power of its legal voters to enact, or amend the charter of any city or town is expressly subject to the Constitution and criminal laws of the state. The penal statutes there mentioned are not merely such enactments of the kind as were in existence at the time the amendment containing that language was adopted. The section evidently includes any criminal law of general application which either branch of the legislative department of the government might afterward enact by virtue of its plenary power. To determine whether the motor vehicle law is a criminal law we have only to advert to the statutory definition of the term "crime" found in Section 1369, L. O. L., reading thus:

"A crime or public offense is an act or omission forbidden by law, and punishable upon conviction by either

of the following punishments: 1. Death; 2. Imprisonment; 3. Fine; 4. Removal from office; 5. Disqualification to hold and enjoy any office of honor, trust or profit under the Constitution or laws of this state."

It is the language of the Criminal Code enacted in 1864, and remains throughout the half century since then. It is so consonant with the signification imparted to the term by courts and law-writers from time immemorial that citation of precedents is superfluous. The motor vehicle law does forbid certain acts and omissions, and provides for their punishment by fine. It is unquestionably a criminal law, and we cannot extract that element from it without utterly disregarding as plain language as ever was written. Like the local option law, as construed in *Baxter* v. *State,* 49 Or. 353 (88 Pac. 677, 89 Pac. 369), the motor vehicle law is a criminal law in that it forbids certain things and provides penalties by fines and imprisonment for violations of its precepts. If for no other reason, this criminal law of the state, by the very terms of the Constitution, must prevail over the city ordinance.

Under present conditions where the people from any part of the state may so easily journey into the metropolis and through the various cities, towns and villages of the state by private conveyances, the matter of travel upon the streets and highways of the commonwealth in every part of it is a legitimate subject for general legislation regulating the same. The streets of Portland do not belong to that city in the property sense of the word. They are dedicated to public use, and are alike open to all citizens of the state. Where not thus freely placed at the service of the public by the original owners of the land, they exist by virtue of the power of eminent domain, which is an original attribute of state sovereignty. As stated by

Mr. Chief Justice WOLVERTON in *Brand* v. *Multnomah County,* 38 Or. 79, 91 (60 Pac. 390, 391, 84 Am. St. Rep. 772, 50 L. R. A. 389):

"Primarily, the state has paramount control over all the highways within its borders, including public streets and highways within the confines of municipalities. Whatever authority a municipality may enjoy or possess, pertaining to its streets and highways, must be derived from the legislative assembly through its franchises or charter; and such a corporation acts, if at all, through a delegated power emanating from the initial source. * * Nor does the mere fact that the state has delegated certain powers to the municipality inhibit it from again assuming or exercising such powers."

It is true that this was written before the amendment of Article XI, Section 2, but it illustrates the principle that the state has original power over city streets and all other highways, and that authority granted to any city may be reassumed by the state to the exclusion of the municipality through exercise of the legislative prerogative. The only question is, How shall the resumption of the grant be accomplished by action of the legislative assembly? It is plain that the only restriction imposed upon the legislative assembly by the people in its fundamental law in such cases is that it shall not interfere with the municipality by any special law, and that the exercise of its legislative authority by means of general laws still exists in its unconfined and pristine vigor. We must remember, also, that the right of a city electorate to amend its charter is subject to the state Constitution, part of which is Article IV, Section 1, declaring that "the legislative authority of the state shall be vested in a legislative assembly," etc. We cannot leave this clause out of the case. It is not overcome by the following section

granting the initiative to municipalities. The latter section only allows cities to use the initiative formula within the scope of their authority, and was never designed to exempt them from their subordination to the Constitution and criminal laws of the state, nor to infringe upon the general law-making power vested in the legislative assembly by Article IV, Section 1. Discussing a similar situation in *Ewing* v. *Hoblitzelle,* 85 Mo. 64, 78, Mr. Justice NORTON said:

"We do not hold that the legislature in exercising the power referred to in Section 25, Article 9, of the Constitution, can exercise it by the passage of a local or special law; but that it can do so by a general law we have no doubt, and when it is exercised, as we think it has been exercised in the act of 1883, by a general law, and such law is, in any of its provisions, in conflict with a charter provision, that the law prevails over the charter in obedience to the mandates of the constitution that 'such charter and amendments shall always be in harmony with and subject to the constitution and laws of the state.' "

The travel of the citizens of the state at large upon its streets, roads and highways is greater in scope and importance than any local or municipal concern, and the legislative assembly, in the exercise of its power through general laws, may well consider it as a legitimate subject for its consideration despite the provisions of any local charter. If the legislative function, as vested in the legislative assembly by Article IV, Section 1, is of any validity whatever, we cannot act as censors upon that co-ordinate branch of the government and say, as we did in *Baxter* v. *State,* 49 Or. 353 (88 Pac. 677, 89 Pac. 369), that the criminal local option law prevails over a city charter, yet, in our judgment, travel on public streets and highways in the state is not a fit subject for the legislature to regulate by means

of a penal statute general in its terms. To establish a contrary rule will cast upon the legislative assembly, as well as upon the judiciary, the burden of ascertaining, not whether the public laws conform to the Constitution of the state as a supreme standard of comparison, but whether they conflict with any of the multitudinous charters from that of the metropolis to that of every little hamlet in the state. To declare the ordinances of the city superior to the laws of the state will be to invite and encourage conflict between the two jurisdictions. An instance of this has already occurred where the council of the City of Portland undertook to prescribe rates of fare on street railways within the city. The United States District Court, speaking by Judge ROBERT S. BEAN, in *Portland Ry., L. & P. Co.* v. *Portland* (D. C.), 210 Fed. 667, held that, as the legislative assembly had committed the regulation of such matters to the railroad commission of the state in its capacity of supervising public utilities under the act of February 24, 1911 (Laws 1911, 483), the city law must yield to that of the state. Other instances of conflict will readily suggest themselves. Suppose any city adopts ordinances governing the sale of farm products, or nursery stock, or the punishment of crime contrary to the state laws on the same subjects, which of the inconsistent enactments must yield? It is plain that the state law will take precedence.

It is said, in substance, in *Straw* v. *Harris*, 54 Or. 424 (103 Pac. 777), that the state cannot lose control over its municipalities, as it would but lead to sovereigntial suicide; and it may be added that it was never the intention of the people to so hamper its legislative assembly on the one hand, and extend the powers of cities and towns on the other, as to lead to the slow death of the state by disintegration.

The people have spoken through their representatives in the motor vehicle law.   It is not for us to question the wisdom of the policy which it announces. We can only declare what the law is.   We should have due respect for the co-ordinate branch of the government and should not declare its utterances to be in violation of the fundamental law unless such a conclusion is supported by incontrovertible authority.   Still further, the principle having been thoroughly settled by the precedents following *Straw* v. *Harris,* 54 Or. 424 (103 Pac. 777), the doctrine of *stare decisis* ought to control, preserving continuity of purpose in decision and certainty of the law.   The motor vehicle law was clearly within the authority of the legislative assembly to enact as a general law with paramount authority over any local legislation whether of charter or ordinance.   The learned judge at the Circuit Court was right in maintaining the supremacy of the state legislation.

The judgment should be affirmed.