## No. 13,574.

### CITY AND COUNTY OF DENVER *v.* HENRY.
(38 P. [2d] 895)

Decided November 26, 1934.   Rehearing denied December 17, 1934.

Mr. James D. Parriott, Mr. Frederick P. Cranston, Mr. Karl C. Brauns, for plaintiff in error.

Messrs. Morrissey, Mahoney & Scofield, Mr. Harold G. King, for defendant in error.

*En Banc.*

Mr. Justice Burke delivered the opinion of the court.

These parties are hereinafter referred to as the city and Henry respectively.

In a collision between a city truck and Henry's automobile in which Henry's wife was a passenger, the latter was killed. Herein Henry sued the city for damages and on a verdict in his favor for $3,000 judgment was entered. To review that judgment the city prosecutes this writ and asks that it be made a supersedeas. Both parties request final disposition of this case on this application, and since the question is of importance to the public, and particularly to the courts in a trial of similar cases, we comply with that request. This cause is the first coming to this court which raises the particular question involved, and it was not at issue here until September 20, 1934.

The accident involved occurred at the intersection of three streets in the city of Denver. As one of its defenses the city alleged that the accident and injury were contributed to and caused by the negligence of Henry, "that, among other things, said negligence consisted in the failure of the plaintiff to yield the right of way to the truck driven by an employee of the defendant, which said truck entered the intersection, described in the complaint, before the automobile driven by plaintiff entered the intersection; that plaintiff failed to grant the right of way to defendant's truck, as provided by the laws of the State of Colorado"; Henry's motion to strike the quoted portion of the city's answer was sustained and the correctness of that ruling is the only question presented and

argued. The motion was sustained on the theory that the right of way was governed by city ordinance, not by statute.

The statute in question provides: "The driver of a vehicle approaching an intersection shall yield the right of way to a vehicle which has entered the intersection. When two vehicles enter an intersection at the same time, the driver of the vehicle on the left shall yield to the driver on the right." S. L. 1931, p. 539, c. 122, §87.

After the passage of that statute the city enacted the following ordinance: "Every driver of a vehicle approaching an intersection of a street shall yield the right of way at such intersection to any vehicle approaching from the right." Sec. 65, Ordinance 16, Series of 1932. If the ordinance controlled here the ruling complained of was right and the judgment must be affirmed. If the statute controlled the judgment must be reversed.

Denver is a "Home Rule" city, organized under article XX of the state Constitution, and section 6 of that article is applicable to it. Said section 6 vests in the city all powers "necessary, requisite or proper for the government and administration of its local and municipal matters," "the full right of self-government in both local and municipal matters," and further provides that statutes applicable shall continue in effect "except in so far as superseded" by charter or ordinance. Hence the question here is, "Is the control of traffic at street intersections in the city of Denver a local or municipal matter?"

The principal authorities relied upon by the city to support its present position are: *Armstrong v. Johnson Co.*, 84 Colo. 142, 268 Pac. 978; *People v. Denver*, 90 Colo. 598, 10 P. (2d) 1106; *Helmer v. Superior Court*, 48 Cal. App. 140, 191 Pac. 1001; *Ex Parte Daniels*, 183 Cal. 636, 192 Pac. 442.

In *Armstrong v. Johnson Co.*, we held that the streets of Denver are "highways of the state" to the extent of bringing Johnson within that phrase as used in a statute imposing a license fee for the operation of trucks for hire. In *People v. Denver* we held that the streets of

Denver are such public highways as to make the city liable for a state gasoline tax imposed under a statute providing that it should be paid by "every person who shall use in this state for propelling a motor vehicle on the public streets or highways any motor fuel," etc. In each of these cases the question was one of taxation, not the exercise of police power, and the legislative intent to include the city was clear. The language used in those opinions must be confined to the questions presented and so confined does not help us here. That city streets are state highways for the purpose of enabling the state to levy taxes on vehicles and their motive power used thereon is no proof that they are such state highways as preclude the city, in the exercise of its police power, from regulating traffic thereon. In the Helmer case defendant was charged with drunken driving in the city of Sacramento in violation of a state statute making the offense a felony. A city ordinance, which he contended controlled, made the offense a misdemeanor. He sought prohibition to prevent trial. The District Court of Appeals held the ordinance inapplicable because the offense was not a "municipal affair" saying that modern conditions had made the handling of automobile traffic "a matter of the gravest concern to the people of the entire state." But the court further rested its conclusion on the right of the state to enact criminal statutes applicable to city streets. This is sound, but some of the language used to support it greatly weakens the court's first conclusion. Confining the court's language to the question before it nothing more is decided than that the protection of the public from a drunken driver was not a matter "of purely municipal concern." In the Daniels case defendant was convicted of violating a speed ordinance of Pasadena and was discharged on habeas corpus because "the regulation of traffic upon the streets of a city is not one of those municipal affairs in which by the constitution chartered cities are given a power superior to that of the state legislature, but that such power is subject to the general laws of the state, and ordinances inconsistent therewith

are invalid." The court held the ordinance invalid under section 11, article XI of the California Constitution because in conflict with the statute. That section of the Constitution authorizes municipalities to make and enforce "such local, police, sanitary, and other regulations as are not in conflict with general laws." Article XX of our Constitution contains no such limitation.

We have heretofore called attention to the fact that "authorities from other states aid but little in ascertaining the intent and purpose of the article (said article XX) in question." Because "It has no counterpart in the constitutions of other states." What power is granted by it has however been fairly well settled by our decisions. It is "Every power possessed by the legislature in the making of a charter for Denver." *Denver v. Hallett,* 34 Colo. 393, 83 Pac. 1066. It is determined "by ascertaining whether the legislature in the absence of article XX could have conferred upon the municipality the power in question." *Londoner v. Denver,* 52 Colo. 15, 119 Pac. 156; *Denver v. Mountain States T. & T. Co.,* 67 Colo. 225, 184 Pac. 604.

Prior to the adoption of article XX the legislature did invest municipalities with control of vehicular traffic. C. L. 1921, p. 2290, §8987, par. 7. Since the adoption of the article we have said that the city, under its charter, "undoubtedly * * * has the power to reasonably regulate vehicular traffic." *Staley v. Vaughn,* 92 Colo. 6, 17 P. (2d) 299. And as disclosed by its charter and ordinance it has continued so to act.

If the city had power, prior to the enactment of the statute, to pass such an ordinance as that here in question, it had that power by virtue of the Constitution, and the statute could not take it away. If the statute, instead of assuming to regulate the right of way at all highway intersections, had pretended to authorize Home Rule cities to do so within their boundaries, could there be any doubt of the validity of an ordinance passed under that statute? Yet the source of authority for the passage

of the ordinance is the Constitution and the city's charter, not a legislative grant.

Considering this question as a practical one, which after all is the best test, there seems no escape from the conclusion that the regulation of traffic at street intersections in the city of Denver is primarily a matter of local concern because proper regulation is almost wholly dependent upon local conditions. It may be easy on country roads, or in small towns, to determine which car first enters an intersection, but the impossibility of so doing at the most congested intersections in the city of Denver, during the hours of heaviest traffic, is clearly apparent to anyone who will stand at one of these corners and use his eyes. A driver there can readily determine who is on his right hand and hence entitled to precede him. But to watch both sides under such circumstances, and particularly to get the necessary mental picture of countless cars coming from four directions and determine with any degree of certainty which has first entered the intersection is beyond human capacity. All men know this and we take judicial knowledge of what all men know.

The argument based upon the simplicity of traffic regulations in "horse and buggy days" as compared with the complication of such regulation and its statewide importance in "automobile days" loses its persuasive power when faced with the facts. This statute was not passed until 1931, whereas article XX of the Constitution was adopted in 1902 and section 6 thereof as it now stands, in 1912.

So for almost thirty years Denver had been a Home Rule city, for almost twenty years said section 6 of article XX had been applicable to it, and for at least fifteen years the regulation of automobile traffic had been a great and growing problem, neither more nor less a matter of local or general concern than in 1932. Yet during all those years such traffic in the city was controlled by the municipality through charter and ordinance

adopted in the exercise of the powers granted by said article XX.

In addition to the foregoing our conclusion is supported by *Kalich v. Knapp*, 73 Ore. 558, 142 Pac. 594, 145 Pac. 22. There the trial court held that a speed ordinance of the city of Portland had been superseded by a general statute. The judgment was reversed on the ground that the motor vehicle act, so far as it attempted to supplant the ordinance, was unconstitutional as in violation of section 2, article XI of the Constitution of that state which provided: "The legal voters of every city and town are hereby granted power to enact and amend their municipal charter, subject to the Constitution and criminal laws of the state of Oregon." This had been construed as a grant of supreme power "in relation to matters purely local" although apparently not a grant of all powers which the legislature might confer. *Thurber v. McMinnville*, 63 Ore. 410, 128 Pac. 43. It should therefore be said that this was a broader grant of power than that contained in the Constitution of California but narrower than that contained in article XX of the Constitution of Colorado.

It is said the Kalich case has been overruled by *Lovejoy v. Portland*, 95 Ore. 459, 188 Pac. 207, and *Rose v. Port of Portland*, 82 Ore. 541, 162 Pac. 498. The first involved the right of the city to tax an insurance agent and the second the right of a port to improve a slough. In neither is the Kalich case specifically overruled and on the point here involved it seems to us untouched. *Lidfors v. Pflaum*, 115 Ore. 142, 236 Pac. 1059, while containing some pertinent expressions need not be examined. What was there said on the subject was clearly dictum, was contrary to the Kalich case, and that portion of the opinion cites no authority.

Our conclusion is that the right of way at street intersections in the city of Denver is controlled by the ordinance in question, not by the statute.

The judgment is accordingly affirmed.

Mr. Chief Justice Adams, Mr. Justice Hilliard and Mr. Justice Holland concur.

Mr. Justice Butler, Mr. Justice Campbell and Mr. Justice Bouck dissent.

Mr. Justice Butler, dissenting.

Being unable to agree with the conclusion reached by a majority of my brethren I respectfully dissent from the decision in this case. The great importance of the question involved calls for a rather full statement of my reasons.

Section 87, chapter 122, Session Laws of 1931 (the Motor Vehicle Act), provides in part: "The driver of a vehicle approaching an intersection shall yield the right of way to a vehicle which has entered the intersection. When two vehicles enter an intersection at the same time the driver of the vehicle on the left shall yield to the driver on the right." Section 119(e) of the statute provides: "Any person violating any of the provisions of this Act shall be deemed guilty of a misdemeanor and upon conviction thereof shall be punished by a fine of not less than twenty-five dollars ($25) or more than five hundred dollars ($500), or by imprisonment in the County Jail not less than thirty days or more than six months, or by both such fine and imprisonment." See also penal provisions in sections 133, 134, 139(a), 140 and 143.

Section 65, Denver Ordinance 16, Series of 1932, provides in part: "Every driver of a vehicle approaching the intersection of a street shall yield the right of way at such intersection to any vehicle approaching from the right."

The trial court held that the ordinance controls, whereas the City and County of Denver insists that the statute controls.

Section 1 of article 5 of the Colorado Constitution vests the legislative power of the state in the General Assembly, reserving, however, to the people the initiative and referendum powers. Unless otherwise provided in

some other part of the Constitution, the General Assembly has plenary power to grant charters to municipalities and otherwise to enact laws that are binding upon and operative within municipalities, concerning both matters of general, statewide concern, and matters of purely local and municipal concern. Has the General Assembly, by any provision of the Constitution, been deprived of any part of that power? If so, of what part has it been deprived? The broad power of legislation reposed in the General Assembly by section 1, article 5, supra, is not to be limited by implication drawn from another provision of that instrument, unless such implication is a necessary one. *Schwartz v. People,* 46 Colo. 239, 104 Pac. 92.

Denver is a Home Rule city, organized under article 20 of the Constitution, commonly referred to as the Home Rule Amendment; and upon section 6 of that article Henry relies. It provides, *inter alia,* as follows:

"The people of each city or town of this state, having a population of two thousand inhabitants * * * are hereby vested with, and they shall always have, power to make, amend, add to or replace the charter of said city or town, which shall be its organic law and extend to all *its local and municipal matters.*

"Such charter and the ordinances made pursuant thereto in *such* matters shall supersede within the territorial limits and other jurisdiction of said city or town any law of the state in conflict therewith. * * *

"* * * such city or town, and the citizens thereof, shall have the powers set out in sections 1, 4 and 5 of this article, and all other powers necessary, requisite or proper for the government and administration of *its local and municipal matters.* * * *

"It is the intention of this article to grant and confirm to the people of all municipalities coming within its provisions the full right of self-government in both *local and municipal matters* and the enumeration herein of certain powers shall not be construed to deny such cities and towns, and to the people thereof, any right or power essential or proper to the full exercise of such right.

"The statutes of the state of Colorado, so far as applicable, shall continue to apply to such cities and towns, except in so far as superseded by the charters of such cities and towns or by ordinance passed pursuant to such charters." (Italics are mine.)

By the Home Rule Amendment the General Assembly has been deprived of only a part of its powers; namely, the power to legislate concerning matters of local and municipal concern, as distinguished from those of general, state-wide concern. The amendment does not create a state within a state. As to matters of general, state-wide concern, the powers of the General Assembly remain unimpaired.

Is the regulation of vehicular traffic at street intersections in municipalities a matter of mere local and municipal concern, or a matter of general, state-wide concern? If the former, article 20 vested in Home Rule cities exclusive power to regulate such traffic; if the latter, such exclusive power was not so vested, and any traffic ordinance in conflict with a statute must yield to the statute. In the opinion of the majority it is the former; in my opinion it is the latter.

In *Keefe v. People,* 37 Colo. 317, 87 Pac. 791, we said:

"But the municipality of Denver, though created by a constitutional amendment by a direct vote of the people, and having the power to frame its own charter, is just as much an agency of the state for the purpose of government as if it was organized under a general law passed by the General Assembly. The mode of its creation does not change the nature of its relation to the state. Like cities and towns organized under the general statutes, it is still a part of the state government. It is as much amenable to state control in all matters of a public, as distinguished from matters of a local, character, as are other municipalities. The state still has the supreme power to enact general laws declaring what shall be its public policy, and it can make them applicable to the city of Denver, as well as to all other cities of the state. This act, in effect, declares that it is the public

policy of the state not to permit any officer or agent of the state, or its municipalities, or any contractor thereof, to employ any workingman in the prosecution of public work for more than eight hours a day, and for a violation of the statute a penalty is provided. What the public policy of the state is rests with its legislative department. The work of building a sanitary sewer by a city, in a sense, is local, in that it affects, primarily, its own citizens; but it is directly connected with the public health, and is a matter of concern and great importance to the people of the entire state.''

In that case, the city was constructing a sanitary sewer belonging to the city. The contractors employed a laborer to work thereon for more than eight hours in each calendar day. We held that the eight-hour statute was operative within the municipality.

In *City and County of Denver v. Bossie,* 83 Colo. 329, 266 Pac. 214, we held that the erection of the Municipal Building in Denver was not such a matter of local and municipal concern as to exempt the municipality from the operation of the statute concerning the use of Colorado materials in public works.

In *People, ex rel., v. McNichols,* 91 Colo. 141, 13 P. (2d) 266, we held that the statute concerning vital statistics was operative in Denver.

In *Walker v. People,* 55 Colo. 402, 135 Pac. 794, we held that a statute forbidding the sale of intoxicating liquor in less quantity than one gallon was in force in Denver, saying in part:

''The plaintiff in error contends, that by the adoption of article XX of the state Constitution the state gave to the people of the city and county of Denver the exclusive power to make, alter, revise or amend their charter; that this, of necessity, included the exclusive right to provide for a system of licensing saloons as well as to fix penalties for the sale of liquor without a license; that the city having made such provisions the section above quoted has been suspended in this territory. We cannot agree with the correctness of this contention. * * *

"* * * The regulation of the liquor traffic is certainly a matter of concern and great importance to the people of the entire state, and there is nothing in the language of article XX to justify the assumption that they intended to relinquish the right to legislate concerning it in any portion of the state."

In *Armstrong v. Johnson Storage & Moving Co.,* 84 Colo. 142, 268 Pac. 978, we said that the streets of a city are highways of the state, and that, notwithstanding the Home Rule Amendment, the statute (S. L. 1927, c. 135) imposing a license fee on motor trucks operated for hire on public highways applies to those operated on the streets of Denver, even though they never leave the city.

In *People v. City & County of Denver,* 90 Colo. 598, 10 P. (2d) 1106, we held that the statute (S. L. 1929, c. 139) concerning a gasoline tax, applies to vehicles propelled by gasoline on the streets and highways of Home Rule cities, and that the streets and highways of a city are public highways of the state.

The suggestion that the two cases last cited are not in point because the question in each was one of taxation, not of the exercise of the police power, seems to me to be without merit. The taxes involved in those cases were taxes upon the privilege of using motor vehicles upon the public highway. *Ard v. People,* 66 Colo. 480, 182 Pac. 892. They were regulatory excise taxes, not property taxes. *Altitude Oil Co. v. People,* 70 Colo. 452, 202 Pac. 180. They were imposed in the exercise, not of the taxing power, but of the police power of the state.

It is said that the Home Rule Amendment conferred upon Denver "every power possessed by the legislature in the making of a charter for Denver"; that the power vested in Denver by that amendment is determined "by ascertaining whether the legislature in the absence of article 20 could have conferred upon the municipality the power in question"; that prior to the adoption of that article the legislature, by paragraph 7 of section 8987 of the Compiled Laws, did invest municipalities with the control of vehicular traffic; and, therefore, that article

vested in the city of Denver the exclusive power to control vehicular traffic on its streets. The quoted language is found in the opinions in the following cases: *City & County of Denver v. Hallett,* 34 Colo. 393, 83 Pac. 1066; *Londoner v. City & County of Denver,* 52 Colo. 15, 119 Pac. 156; and *City & County of Denver v. Mountain States T. & T. Co.,* 67 Colo. 225, 184 Pac. 604. That language, as is the case with reference to all language used in opinions, should be read in the light of the facts and limited to the facts and issues involved. *American Mortgage Co. v. Logan,* 90 Colo. 157, 7 P. (2d) 953. As was said by Mr. Justice White in *United States v. Eaton,* 169 U. S. 331, 348, 18 Sup. Ct. 374, "General language must be confined to the precise state of facts with reference to which it was used."

What were the facts and issues involved in those three cases? In the Hallett case the question was whether the city had power to build an auditorium. No one suggested that that was a matter of general, state-wide concern. It was contended that the building was to be used for private purposes, and that the Home Rule Amendment did not, either expressly or by implication, confer upon the municipality the power to build it. We held to the contrary. The language quoted above, applied to the facts, means that all powers concerning local and municipal matters that the legislature, prior to the adoption of the Home Rule Amendment, could have conferred upon the municipality are now vested in it by virtue of that amendment. The same situation was presented in the Telephone case and the Londoner case. The former involved the power of the municipality to regulate local telephone rates; the latter, its power to acquire, by condemnation, land for a city park. That I have correctly interpreted the language used in the three cases is clear, as will appear from a consideration of Walker v. People, already cited. A statute prohibited the sale of intoxicating liquors in less quantity than one gallon by one not having a license. Power to deal with that subject could have been conferred by the legislature prior to the adoption of the

Home Rule Amendment, and actually was conferred by charter. See Denver Charter of 1893, as amended in 1895 and 1897. Therefore, if the language used in the three cases we are discussing is to be taken broadly and not confined to the facts and issues then before the court, the Home Rule Amendment vested in the municipality exclusive power over such matters. But, as we have seen, we held to the contrary in the Walker case.

It is said that in *Staley v. Vaughn*, 92 Colo. 6, 17 P. (2d) 299, we remarked that "Undoubtedly, under the charter of the City and County of Denver, the city council has the power to reasonably regulate vehicular traffic on Denver's public streets." But no such question was raised or discussed in that case. The question there presented to the court was whether a Denver ordinance conferring upon the manager of safety the power to designate streets as "through" or "stop" streets and to regulate traffic thereon, was unconstitutional as a delegation of legislative powers; and that was the only question decided. Besides, the injuries occurred in 1929, and at that time there was no traffic statute applicable to Denver. The Motor Vehicle Act of 1931 had not been passed, and the statute regulating traffic in 1929 did not attempt to govern traffic in municipalities. See Compiled Laws, chapter 8, "Rules of the Road." Of course, in the absence of a conflicting statute, the city had the power reasonably to regulate vehicular traffic on its streets.

Our attention is called to paragraph 7 of section 8987 of the Compiled Laws of 1921, purporting to confer upon municipalities power to regulate street traffic, and we are invited to infer therefrom that such regulation is a matter of mere local and municipal concern. That provision appeared first in section 2655 of the General Laws of 1877, and it was carried forward into subsequent compilations and revisions.

What was the situation when that provision was adopted? In 1870 the population of Colorado was only 39,864, and that of Denver only 4,759. In those days people traveled principally (indeed almost altogether),

on railroad trains; some horse-drawn vehicles were used in business for delivery purposes; a few people used horses and buggies for pleasure driving; some rode horseback; sometimes a person would drive into another county; occasionally there was a runaway, but accidents at street intersections were so rare as to call for no statute or ordinance regulating rights of way at such intersections. The 1877 charter of Denver conferred the power to prevent horse racing and fast driving in the streets (sec. 38), and an ordinance was passed in the exercise of that power (art. II, sec. 2). Another ordinance provided that vehicles approaching each other should pass to the right (art. II, sec. 8); still another gave the right of way to hose and hook and ladder companies going to a fire (art. V, sec. 1). In 1881, though the population of Colorado had reached 194,327, and that of Denver, 35,629, traffic conditions had not changed materially, and the charter and ordinances were substantially the same as in 1877. In 1885 the charter and ordinances, so far as pertinent to this discussion, remained substantially the same as above, but there was added a provision forbidding vehicle drivers to drive "faster than a moderate trot" (art. IX, sec. 42); and a provision that no person should drive at a "faster or greater rate of speed than six miles an hour," or drive across any crosswalk or around any corner at a "faster or greater rate of speed than four miles an hour" (art. VI, sec. 1); and a provision concerning warning gongs and lights on bicycles, tricycles, velocipedes, and "other riding machines" (art. VI, sec. 2).

In the horse-and-buggy and bicycle days street accidents in cities and towns were so few and comparatively so free from serious consequences that they were considered to be matters of merely local and municipal concern; and they continued to be so considered until the advent of the automobile. Then all was changed. Traffic dangers, formerly slight, increased rapidly and soon became a matter of major importance and of state-wide concern. In 1930 the population of Colorado was 1,035,-781; that of Denver, 287,861; and the number of regis-

tered motor vehicles in the state had increased from 15,888 in 1913 to 309,568, and many thousands of automobiles brought tourists from every state in the Union. In the United States the number of automobile accidents resulting in fatal and non-fatal injuries increased enormously. In 1927, 25,000 persons were killed in automobile accidents, exclusive of motorcycle mishaps. In 1933, 29,900 persons were killed and 870,000 injured. We do not have at hand statistics for the entire state of Colorado, but in Denver alone, in 1932, according to the official report of the Police Department, there were 6,082 automobile accidents, which resulted in 67 deaths. By far the greatest number of the accidents (4,631) occurred at street intersections, and such accidents resulted in 41 deaths.

Throughout the United States municipalities made ineffectual efforts to cope with the new menace to life and limb. Berry, in volume 1, section 34, of his work on Automobiles (6th Ed.), thus describes the situation: "The local communities, possessing power to legislate, presented patchworks of incongruous legislation. Each municipality had its own code of regulations, and the operator of an automobile could form no idea from reading the rules of one municipality what new or different regulations he might have to observe when he crossed the line into the jurisdiction of some municipal neighbor. Then it was that the necessity for uniform state regulation became manifest * * *."

Such was the situation when the Second National Conference on Street and Highway Safety, held in 1926, adopted a proposed Code which it recommended to the state legislatures for enactment. With reference thereto President Hoover, chairman of the Conference, said: "This proposed Code was formulated with the widest cooperation of those having understanding and experience in these matters, with a view to advancing uniformity in our traffic laws and regulations. The urgency of such action requires no emphasis from me. It has been demanded from every state in the Union. Without uni-

formity in essential laws and regulations, reduction in loss of life, personal injury and property damage upon our streets and highways is virtually impossible."

The proposed Code, amended in a few particulars, was adopted unanimously in May, 1930, at the Third Conference, which was participated in by delegates from nearly every state in the Union, including official representatives appointed by the governors of forty-two states. The proposed Code was approved by the American Bar Association and the National Conference of Commissioners on Uniform State Laws. It is the result of exhaustive study of traffic accidents and is the product of the best thought on the subject of accident-prevention in cities and towns as well as in the country, and before November, 1930, was adopted, in whole or in substantial part, or was used as the basis of revision of existing motor vehicle laws, by approximately one-half of the states. Colorado adopted it in 1931. The provision of our 1931 statute regulating the right of way at street intersections and now under consideration, is identical with the provision on the same subject in that Code. See 9 Uniform Laws, Annotated, p. 355, §35.

Courts do not blind themselves to changed conditions. For example, various kinds of business that at one time were regarded as merely private have become affected with a public interest because of changed conditions, and therefore subject to regulations that formerly were held to be unconstitutional. As was said in *German Alliance Insurance Co. v. Lewis,* 233 U. S. 389, 34 Sup. Ct. 612, "A business, by circumstances and its nature, may rise from private to be of public concern, and be subject, in consequence, to governmental regulation." In *People v. United Mine Workers of America,* 70 Colo. 269, 201 Pac. 54, we referred to that case and approved the principle therein announced. It is equally true that the right of way at street intersections, by circumstances and its nature, may rise from a matter of merely local and municipal concern to be a matter of general, state-wide concern. That, in my opinion, has come to pass in the present in-

stance, and we should hold, therefore, that the Home Rule Amendment does not prevent the General Assembly from enacting, for the protection of life, limb and property, a statute defining and regulating the right of way for vehicles at street intersections in Home Rule cities.

That after the adoption of the Home Rule Amendment, Denver continued to regulate vehicular traffic by ordinance, does not militate against the position taken in this opinion. Not until the passage of the Motor Vehicle Act in 1931 was there any statute regulating vehicular traffic in municipalities, and a traffic ordinance is void only when it conflicts with a statute on the subject.

In *Helmer v. Superior Court,* 48 Cal. App. 140, 191 Pac. 1001, it was held that the regulation of street traffic since the advent of the automobile is no longer a municipal matter, but has become a matter of state-wide importance. In the opinion the following pertinent language appears:

"The Motor Vehicle Act, so far as it applies to this case, is inconsistent with the ordinance of the city of Sacramento, above referred to, * * *. If the offense in question is a 'municipal affair,' as that term is used in section 6 of article XI of the Constitution, it must be conceded at once that the city ordinance is paramount. The regulation of street traffic has usually in the near past been treated as a municipal matter. Until the advent of the automobile, interurban traffic was so small as to be negligible and, as a result, traffic regulations were a matter of concern only to the inhabitants of the city. But when autos and motor-trucks invaded our highways and streets in tens and hundreds of thousands, a matter that yesterday was local has become of state and nation-wide importance today. * * *

"The term 'municipal affairs' is not a fixed quantity, but fluctuates with every change in the conditions upon which it is to operate. Interurban traffic has grown in the past ten years into enormous proportions. * * *

"The great number of autos, their high speed, their use of a non-intelligent motive power, the want of ade-

quate room on roads, and streets not laid out for such a congested traffic and the overwhelming necessity for uniformity in handling the traffic, all have forced the conviction that the proper and orderly handling of this stupendous traffic has become a matter of the gravest concern to the people of the entire states. * * * In short, almost every citizen of the state has as great an interest in the traffic regulations of neighboring cities as he has in his rural highways about him and vastly more concern as to what they are and how they are to be observed. It may be doubted whether any other police problem requires such unfailing uniformity, one city or locality with another, as that of handling the endless procession of motor vehicles on our highways. * * *

"Since the advent of motor vehicles in such vast numbers and the passage of the Motor Vehicle Act, a number of cases have been decided by our state courts involving traffic regulations of the state and of chartered cities, and it is a persuasive fact that in no case has it been held that the city ordinance is supreme. The contrary assumption appears to have been universal."

In *Ex Parte Daniels,* 183 Cal. 636, 192 Pac. 442, the court held that the regulation of street traffic is not one of those municipal affairs in which by the Constitution chartered cities are given a power superior to that of the state legislature, but that such power is subject to the general laws of the state, and ordinances inconsistent therewith are invalid.

But it is said that the California cases are not applicable because the Constitution of that state, unlike ours, purports to confer upon municipalities power to make such regulations only "as are not in conflict with general laws." That contention, I submit, is without merit. Section 11, article XI, California Constitution, it is true, provides that "any county, city, town, or township may make and enforce within its limits all such local, police, sanitary, and other regulations as are not in conflict with general laws." But the constitutional provision applicable to *chartered* cities (and the cities whose ordinances

were involved in the California cases cited above are chartered cities) is section 6, article XI, which, like our Constitution, makes city charters and ordinances upon "municipal affairs" paramount, as to such affairs, to general laws in all cities organized under a freeholders' charter. Thus, in the Daniels case, supra, the court said: "If the matter of the speed to be allowed in the streets of a city is a municipal affair section 6 [of article XI], of course, settles this case." Nor does the fact that the traffic regulations involved in the California cases make a violation thereof punishable by fine or imprisonment differentiate those cases from the case at bar; for, as we have seen, our statute makes a violation of its provisions a crime and prescribes penalties therefor.

It is said that in Oregon the Supreme Court holds that the Motor Vehicle Act, so far as it attempts to supplant the traffic ordinance of Portland, is unconstitutional as in violation of section 2 of article XI of the Oregon Constitution, which provides: "The legal voters of every city and town are hereby granted the power to enact and amend their municipal charter, subject to the Constitution and criminal laws of the state of Oregon." *Kalich v. Knapp*, 73 Ore. 558, 142 Pac. 594, and 145 Pac. 22, which is cited in the majority opinion in support of the statement, does so hold. But that decision was weakened by two dissenting opinions, and was criticised in *Lovejoy v. Portland*, 95 Ore. 459, 188 Pac. 207; and in *Lidfors v. Pflaum*, 115 Ore. 142, 205 Pac. 277, and 236 Pac. 1059, the court used language utterly at variance with the law as announced in the Kalich case.

In the Lovejoy case the court held that a statute prohibiting cities from imposing a license tax on insurance agents does not contravene a Constitutional provision prohibiting the legislature from entering into the field of municipal legislation. The court said:

"Although * * * there was a lack of complete harmony among the precedents, yet the most of them held in plain and unmistakable language that the legislature was not prohibited from passing general laws concerning

cities and towns, while only a few of them held that the legislature was prohibited from passing general laws regulating intramural authority. * * *

"Of the three cases classified in *State v. Port of Astoria* as belonging to the minority, *Kalich v. Knapp,* 73 Ore. 558 (142 Pac. 594), 145 Pac. 22, Ann. Cas. 1916E, 1051), is the one most frequently referred to and constitutes the main reliance of the defendant. In each of these cases one or more members of the court raised a dissenting voice, and in not one of them did all members of the court concur. It is a noteworthy fact that in each of the three cases listed with the minority one or more members of the court dissented, while in each of the six cases belonging to the majority all the members of the court concurred in the conclusion reached * * *.

"The rule unanimously adopted in *Rose v. Port of Portland* is decisive of the question here presented. * *. * The issues which the court was compelled to decide in *Rose v. Port of Portland,* in order to adjudicate the litigation, involved an examination and decision of the question which the defendant is here attempting to raise."

In the Lidfors case the question was whether the traffic ordinance of Portland conflicted with the traffic statute. If it did, the ordinance was void; if it did not, the ordinance was valid. The court held that the ordinance was valid because it did not conflict with the statute. The court said:

"It would be a sad commentary on the wisdom of the electorate if we should hold that the movement of a citizen of the state or a traveler from abroad was subject to the whim of every municipality, great or small, between the Columbia River and the California line as to the rate of speed he should drive and the care he should exercise for the protection of others lawfully using the public highway. * * *

"City Ordinances may possibly be valid when not in conflict with the state [statute?]. But when in conflict, they must yield to the right of the state to protect its citizens and the strangers within its gates everywhere."

The opinion on the merits (115 Ore. at 153) was writ-ten by Chief Justice McBride, who, when Associate Justice, wrote one of the dissenting opinions in the Kalich case. In the Lidfors case there was no dissent. So it seems that the doctrine of the Kalich case has been discredited in Oregon. It never prevailed elsewhere, so far as we are advised.

*Thurber v. McMinnville,* 63 Ore. 410, 128 Pac. 43, is cited in the majority opinion, but its bearing upon the present controversy is not apparent. There it was held that section 2 of article XI, referred to above, did not confer power upon a municipality to extend its territory to include new territory without the consent of the citizens of the territory sought to be annexed; such matters being governed by statute.

The question of the relative merits of the two regulations is discussed by counsel and in the majority opinion. It would seem that that is a question for the lawmaking department, and that at this time we are concerned only with the question of the *power* to make traffic regulations. Nevertheless, as a practical matter it is unfortunate that the ordinance, rather than the statute, is held to control the right of way. A similar right-of-way provision appeared in a former ordinance, and it had to be construed or, to be accurate, judicially reconstructed, in order to make it intelligible and enforceable. The trial court reconstructed it in one way; this court, in another. *Golden Eagle Dry Goods Co. v. Mockbee,* 68 Colo. 312, 189 Pac. 850. And even under the reconstructed ordinance, a driver must speculate on whether there is a "likelihood" of collision with a car approaching from the right and must gamble on the result. One having at hand both the ordinance and the Mockbee opinion would have a fairly good idea of his rights and duties, but even then the matter would not be free from the uncertainties pointed out in the concurring opinion in *Potts v. Bird,* 93 Colo. 547, 27 P. (2d) 745.

Denver continues the attempt to regulate traffic at street intersections by the ordinance provision quoted

above. The results are alarming, according to the report of the Division of Vital Statistics just published by the Department of Commerce of the United States. Eighty-six cities are listed in that report. For the fifty-two weeks ending September 2, 1933, only seven cities had a larger number of deaths from automobile accidents per 100,000 population than Denver. For the fifty-two weeks ending September 1, 1934, only one city had a larger number of such deaths per 100,000 population than Denver. With the ordinance adjudged to be controlling, what will the future bring?

After careful consideration of the many traffic regulations throughout the United States, the Safety Conference, already referred to, rejected as dangerous, or at least unsatisfactory, such regulations as appear in the Denver ordinance, and adopted as the safest and best for cities as well as the country—the necessity is greater in cities—a regulation so plain and clear that no one can misunderstand it; namely, the regulation appearing in our Motor Vehicle Act and now before us for consideration. It makes the street intersection a safety zone, within which a person may have some assurance that his life and limb will be protected. A driver approaching it knows its character and, without having to read any court opinion, knows his rights and duties. If keeping his car under such control that he can yield the right of way to one entitled to it should result occasionally in the loss of a few moments, or even a few minutes, it would be a small price to pay for the preservation of human life and limb.

The framers of the Motor Vehicle Act were not unmindful of varying local conditions, but made due allowance therefor. The statute leaves for local regulation certain matters concerning which uniformity is not of vital importance. Thus, local authorities may prescribe the method of turning at intersections, provided they indicate by buttons, markers or signs the course to be followed (sec. 85b); may designate main traveled or through highways by erecting signs notifying drivers to

come to a full stop before entering or crossing such highways (sec. 90); may regulate traffic by means of traffic officers, semaphores or other signalling devices, prohibit other than one-way traffic upon certain highways, regulate the use of highways by processions or assemblages, regulate speed in public parks provided they erect adequate signs giving notice thereof (sec. 104b); may prohibit or regulate the use of certain highways for a limited period of time, when, by reason of deterioration, etc., said highways would otherwise be damaged (sec. 113); and may erect appropriate signs designating residence and business districts, highway and railway grade crossings, and also signs to give notice of local parking and other special regulations (sec. 128).

Surely, enough is left for local regulation to meet all the requirements of varying local conditions.

The decision in this case seems to me to be most unfortunate. There remains only one way to avoid the deplorable results likely to follow, and that is for all Home Rule cities to adopt traffic regulations in harmony with those in the Motor Vehicle Act.

I submit that reason and authority support the conclusion that the Motor Vehicle Act, and not the ordinance, determines and controls the right of way of vehicles at street intersections in Denver and other Home Rule cities, as well as in other municipalities and in the country.

MR. JUSTICE CAMPBELL and MR. JUSTICE BOUCK concur in this dissenting opinion.